[No. 46863-4-I. Division One. September 17, 2001.]

LARRY MOSS, ET AL., *Appellants*, v. THE CITY OF BELLINGHAM, ET AL., *Respondents*.

10

*Michael Frome* and *Larry Moss*, pro se.

*Dana David*; and *John C. Belcher* and *Jack O. Swanson* (of *Belcher, Swanson, Lackey, Doran, Lewis & Robertson*), for respondents.

BAKER, J. — A group of Bellingham citizens filed a land use petition challenging the City of Bellingham's decision to issue a preliminary plat approval for a large subdivision after the City issued a Determination of Nonsignificance (DNS) under the State Environmental Policy Act (SEPA). The citizens argued that the project has significant environmental impacts and requires a full environmental impact statement (EIS). The project developers argued that sweeping regulatory changes in 1995 integrating SEPA project review with the Growth Management Act (GMA) enabled the City's planners to rely on existing laws and regulations, and to mitigate the adverse impacts of the project in order to bring it below the threshold for EIS preparation. The trial court affirmed the City's preliminary plat approval, and the citizens appeal. We affirm.

I

This case involves a citizens' challenge to the City of Bellingham's approval of a preliminary plat for the Birch Street subdivision. The property is owned by Bellingham 88 LLC. Pennbrook Company, an Oregon developer, plans to purchase and develop the property.

The proposed project is a 79-acre, 172-lot subdivision. The site generally slopes downward from south to north and is characterized by ridges and swales, with two creeks running through the property. The property was logged by a previous owner, and is now covered with an immature to semimature deciduous-coniferous tree canopy. The remnant logging roads are now used as hiking and biking trails. There is a power line on the south boundary, with the adjoining land recently logged. Property to the north is residential, to the west is forested and then residential, and to the east is forested. The project site is located in Area 11 of the Whatcom Falls Neighborhood Comprehensive Plan, adopted by the City of Bellingham in compliance with the Growth Management Act. The comprehensive plan provides for residential single occupancy in this area with a density of one lot per 20,000 square feet average overall cluster density. Although the area is zoned for residential

development, the plan acknowledges that "[t]he steep topography and resultant drainage problems, combined with difficult access routes place limitations on the density of this area. Efforts should be made to mitigate these impacts as this sensitive hillside develops."

The SEPA project review process began when Pennbrook filed an environmental checklist with the City of Bellingham in the fall of 1998. This was soon followed by a formal application for subdivision approval. The Bellingham City Planning and Development Commission held a public meeting to hear concerns about the project and to determine whether additional environmental analysis and mitigation would be necessary. The City's SEPA official, Chris Spens, then mailed a letter to Pennbrook requesting further information in the form of an Environmental Assessment (EA). Pennbrook prepared and submitted an extensive EA detailing the project's environmental impacts, including traffic studies, wetlands assessments, geological engineering reports, and watershed studies. The EA also suggested a number of mitigation measures as part of a revised project proposal. The City circulated the EA to the agencies on its distribution list and requested comments within 14 days.

The day after the City received Pennbrook's EA, Spens issued a Determination of Nonsignificance under SEPA. The parties dispute whether the City mailed the DNS to all agencies with jurisdiction. The DNS was published in the Bellingham Herald, and was subject to the same public comment period as the EA. Several agencies submitted comments on the DNS, and more than 200 citizens wrote letters to the City expressing their concern with the DNS and requesting an EIS.

Three weeks after the DNS was issued, the Bellingham Planning and Community Development Department issued a staff report recommending rejection of the preliminary plat application, even with mitigation as proposed in

Pennbrook's environmental assessment.[1] The Bellingham Planning and Development Commission held four public hearings and work sessions to consider revisions and modifications to the preliminary plat. The commission eventually recommended to the city council that the preliminary plat be approved subject to a number of new conditions, including larger lot sizes, and preservation of open space corridors, wetlands, and trail systems. The city council then held six more public meetings and work sessions before finally approving a modified preliminary plat. The project as approved by the city council included another increase in minimum lot size and imposed an additional 33 conditions, including the retention of a popular hiking trail through the site.

A group of citizens filed a petition pursuant to the Land Use Petition Act (LUPA)[2] challenging the City's preliminary plat approval. The trial court ruled in favor of Pennbrook and entered a judgment affirming the City's land use decision. The citizens now appeal.

## II

■■■ A governmental agency's SEPA threshold determination is reviewed under the "clearly erroneous" standard.[3] "A decision is clearly erroneous when the court is 'left with the definite and firm conviction that a mistake has been committed.' "[4] We do not substitute our judgment for that of the decision-making body, but we examine the record in light of public policy contained in the legislation authorizing the decision.[5] An agency's decision to issue a

---

[1] This report was authored by Spens, the same SEPA official who issued the DNS.

[2] Ch. 36.70C RCW.

[3] RCW 36.70C.130(1)(d); *Ass'n of Rural Residents v. Kitsap County*, 141 Wn.2d 185, 195-96, 4 P.3d 115 (2000).

[4] *Ass'n of Rural Residents v. Kitsap County*, 141 Wn.2d 185, 196, 4 P.3d 115 (2000) (quoting *Cougar Mt. Assocs. v. King County*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988)).

[5] *Rural Residents*, 141 Wn.2d at 196.

mitigated DNS and not to require an EIS is accorded substantial weight.[6]

SEPA Framework

■ SEPA was enacted in 1971 to "promote the policy of fully informed decision making by government bodies when undertaking 'major actions significantly affecting the quality of the environment.' "[7] Contrary to popular belief, "SEPA does not demand a particular substantive result in government decision making"; rather, it ensures that environmental values are given appropriate consideration.[8]

Before a local government processes a permit application for a private land use project, it must make a "threshold determination" of whether the project is a "major action[] significantly affecting the quality of the environment."[9] A threshold determination, made by the "responsible official" of the "lead agency" reviewing the project, is required for any project constituting a SEPA "action" unless it is "categorically exempt."[10] The lead agency must make its threshold determination based upon information reasonably sufficient to evaluate the environmental impact of a proposal.[11] The lead agency first reviews an environmental checklist prepared by the applicant.[12] If the checklist does not contain sufficient information to make a threshold determination, the applicant may be required to submit additional information.[13] The responsible official may also consider mitigation measures which an agency or the

---

[6] RCW 43.21C.090; *Indian Trail Prop. Owner's Ass'n v. City of Spokane*, 76 Wn. App. 430, 442, 886 P.2d 209 (1994).

[7] *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 272, 552 P.2d 674 (1976).

[8] *Anderson v. Pierce County*, 86 Wn. App. 290, 300, 936 P.2d 432 (1997).

[9] RCW 43.21C.030(2)(c); *Anderson*, 86 Wn. App. at 300-01.

[10] WAC 197-11-310(1), (2).

[11] WAC 197-11-335.

[12] WAC 197-11-315.

[13] WAC 197-11-335(1).

applicant will implement as part of the proposal.[14]

All threshold determinations must be documented in a determination of nonsignificance or a determination of significance (DS).[15] A DS mandates the preparation of a full EIS. Conversely, a DNS means that no EIS is required.[16] Alternatively, under the "mitigated DNS" process, an applicant may avoid EIS preparation by clarifying, changing, or conditioning the project to mitigate its significant adverse environmental impacts.[17] However, if the project continues to have a significant adverse environmental impact, even with mitigation measures, an EIS shall be prepared.[18]

SEPA Regulatory Reform

■ The seeds of SEPA regulatory reform were sown with passage of the Growth Management Act in 1990. The GMA requires Urban Growth Areas (UGAs) to be designated only after preparation of an EIS.[19] In 1995, this fundamental policy change came to fruition when the Legislature enacted the Integration of Growth Management Planning and Environmental Review Act. Laws of 1995, ch. 347. According to Professor Settle, the Integration Act "seeks to avoid duplicative environmental analysis and substantive mitigation of development projects by assigning SEPA a secondary role to (1) more comprehensive environmental analysis in plans and their programmatic environmental impact statements and (2) systematic mitigation of adverse environmental impacts through local development regulations and other local, state, and federal environmental laws."[20]

■ Several provisions of the Integration Act bear di-

---

[14] WAC 197-11-330(1)(c).

[15] WAC 197-11-310(5)(a), (b).

[16] WAC 197-11-340.

[17] WAC 197-11-350(3).

[18] WAC 197-11-350(2).

[19] Ch. 36.70A RCW.

[20] RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS, App. E, at 505 (1995).

rectly on this case. RCW 43.21C.240, as implemented by WAC 197-11-158, substantially streamlines the threshold determination process for cities and counties planning under the GMA by authorizing the SEPA official to rely on existing plans, laws and regulations in meeting SEPA requirements:

(1) In reviewing the environmental impacts of a project and making a threshold determination, a GMA county/city may, at its option, determine that the requirements for environmental analysis, protection, and mitigation measures in the GMA county/city's development regulations and comprehensive plan adopted under chapter 36.70A RCW, and in other applicable local, state, or federal laws or rules, provide adequate analysis of and mitigation for some or all of the specific adverse environmental impacts of the project.

WAC 197-11-158. While simplifying the project review process, WAC 197-11-158 maintains SEPA's function as an environmental full disclosure law by directing decision makers to decide whether the impacts have fully or partially been addressed or mitigated:

(2) In making the determination under subsection (1) of this section, the GMA county/city shall:

(a) Review the environmental checklist and other information about the project;

(b) Identify the specific probable adverse environmental impacts of the project and determine whether the impacts have been:

(i) Identified in the comprehensive plan, subarea plan, or applicable development regulations through the planning and environmental review process under chapter 36.70A RCW or this chapter, or in other local, state, or federal rules or laws; and

(ii) Adequately addressed in the comprehensive plan, subarea plan, applicable development regulations, or other local, state, or federal rules or laws by:

(A) Avoiding or otherwise mitigating the impacts; or

(B) The legislative body of the GMA county/city designating as acceptable the impacts associated with certain levels of

service, land use designations, development standards, or other land use planning required or allowed by chapter 36.70A RCW;

(c) Base or condition approval of the project on compliance with the requirements or mitigation measures in the comprehensive plan, subarea plan, applicable development regulations, or other local, state, or federal rules or laws[.]

Where some (but not all) of a project's significant adverse environmental impacts have been addressed by existing plans, regulations and laws, WAC 197-11-158 mandates additional review. Planners may not impose additional mitigation measures on impacts which have been adequately addressed elsewhere:

(3) Project specific impacts that have not been adequately addressed as described in subsection (2) of this section might be probable significant adverse environmental impacts requiring additional environmental review. Examples of project specific impacts that may not have been adequately addressed include, but are not limited to, impacts resulting from changed conditions, impacts indicated by new information, impacts not reasonably foreseeable in the GMA planning process, or impacts specifically reserved in a plan EIS for project review.

. . . .

(5) If a GMA county/city's comprehensive plan, subarea plan, or development regulations adequately address some or all of a project's probable specific adverse environmental impacts, as determined under subsections (1) and (2) of this section, the GMA county/city shall not require additional mitigation under this chapter for those impacts.

The Act further integrates the GMA with the SEPA process in a new chapter entitled "Local Project Review." RCW 36.70B.030 states that "[f]undamental land use planning choices made in adopted comprehensive plans and development regulations shall serve as the foundation for project review" and authorizes local governments to "determine that the requirements for environmental analysis and mitigation measures in development regulations and other applicable laws provide adequate mitigation for some or all

of the project's specific adverse environmental impacts to which the requirements apply." In addition, under RCW 36.70B.040, local governments must determine a proposed project's consistency with its development regulations or comprehensive plan during project review by considering the type of land use, level of development, infrastructure, and development characteristics.

Analysis

Appellants rely heavily on *Norway Hill Preservation & Protection Ass'n v. King County Council*[21] in arguing that the City's decision to issue a DNS for the Birch Street project was clearly erroneous. They argue that under *Norway Hill*, a large scale subdivision such as the Birch Street project has per se significant environmental impacts requiring an EIS. They also contend that the 1995 SEPA regulatory reforms do not change this result because the DNS could not have been issued pursuant to WAC 197-11-158. In support of this claim, they point out that the DNS failed to specifically refer to WAC 197-11-158 and the EIS prepared for the City's comprehensive plan. They further contend that the SEPA official could not have relied on WAC 197-11-158 in issuing the DNS because if he felt that the comprehensive plan, development regulations, and other laws provided adequate mitigation for the specific adverse environmental impacts of the project, he would not have required the applicant to provide a supplemental EA and would not have recommended rejection of the project in his staff report. Appellants do not challenge the trial court's finding that the Birch Street project is consistent with the comprehensive plan and development regulations, but rather contend that those plans and regulations do not, standing alone, sufficiently mitigate the project's impacts.

Though it is quite understandable that local citizens would find it hard to believe that a large subdivision has "no significant impact" and does not require an EIS, the law is on Pennbrook's side. First, appellants' reliance on

---

[21] 87 Wn.2d 267, 552 P.2d 674 (1976).

*Norway Hill* for the proposition that a large subdivision automatically requires an EIS is misplaced. In *Norway Hill*, King County's planning department issued a DNS for a large subdivision consisting of 198 single-family dwellings on a heavily wooded 52-acre site outside the Bothell city limits.[22] King County planners issued a DNS and recommended approval of the project subject to certain conditions.[23] After public hearings and several appeals to the King County Council resulting in remands for more study, the council approved the plat.[24]

On appeal to the Washington Supreme Court, the dispositive issue was the proper scope of judicial review applicable to a SEPA threshold determination. The court held that a DNS must survive not only the deferential "arbitrary or capricious" standard, but also the broader "clearly erroneous" standard.[25] The court felt that the "clearly erroneous" standard was appropriate for review of threshold determinations because it allows the court to give substantial weight to the agency determination as required by RCW 43.21C.090 while also examining the entire record in light of SEPA's public policy of full disclosure and consideration of environmental values.[26]

Applying this standard, the court reversed the Norway Vista DNS.[27] In considering whether a project significantly affects the environment, "the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability."[28] The court noted that the project would transform a heavily wooded area into a large subdi-

---

[22] *Norway Hill*, 87 Wn.2d at 269.

[23] *Norway Hill*, 87 Wn.2d at 269.

[24] *Norway Hill*, 87 Wn.2d at 270.

[25] *Norway Hill*, 87 Wn.2d at 273-74.

[26] *Norway Hill*, 87 Wn.2d at 275.

[27] *Norway Hill*, 87 Wn.2d at 278.

[28] *Norway Hill*, 87 Wn.2d at 278.

vision, and held that an EIS was required because "on its face the Norway Vista project will significantly affect the environment."[29] The court acknowledged that the council had extensively considered the matter and issued its approval without an EIS only after imposing conditions designed to protect the environment, but this did not change the result. Nor did the project's consistency with the comprehensive plan.[30]

Appellants contend that *Norway Hill* mandates an EIS for large subdivisions, regardless of mitigation measures. However, when *Norway Hill* was decided in 1976, the mitigated DNS (MDNS) process did not yet exist. The MDNS has its roots in *Hayden v. City of Port Townsend.*[31] In *Hayden*, the Washington Supreme Court upheld a DNS issued after officials worked with the project proponents and government agencies to remedy environmental deficiencies in the proposed plan.[32] Although there was nothing in SEPA or its regulations expressly authorizing this process, the court deemed it "eminently sensible" and stated that:

> [w]here it is feasible, it appears reasonable to resolve potential environmental problems before a formal application is made for a building permit. The pertinent question is whether environmental factors were adequately considered before a final decision was made.[33]

Four years after *Hayden*, the MDNS process was "embraced by the SEPA Rules and reined in by process requirements"[34] with the promulgation of WAC 197-11-350. Commentators have stressed the potential for abuse, contending

---

[29] *Norway Hill*, 87 Wn.2d at 278.

[30] *Norway Hill*, 87 Wn.2d at 279.

[31] 93 Wn.2d 870, 613 P.2d 1164 (1980), *overruled on other grounds by Save a Neighborhood Env't (SANE) v. City of Seattle*, 101 Wn.2d 280, 676 P.2d 1006 (1984).

[32] *Hayden*, 93 Wn.2d at 880-81.

[33] *Hayden*, 93 Wn.2d at 880-81.

[34] SETTLE, *supra*, § 13(d)(vi) at 137.

that the MDNS permits agencies to dispense with EIS preparation on the basis of "illusory commitments."[35] Not surprisingly, though, the MDNS has found favor with courts and decision makers as "conducive to efficient, cooperative reduction or avoidance of adverse environmental impacts."[36] Therefore, to the extent that *Norway Hill* can be read to mandate an EIS for every large subdivision, regardless of attempts to mitigate the impacts prior to permitting, it is no longer good law.[37]

Appellants next contend that the Birch Street DNS could not have been an MDNS because it contained a statement that it was issued pursuant to WAC 197-11-340 (the DNS regulation) and did not cite or discuss WAC 197-11-350 (the MDNS regulation). But WAC 197-11-310(5) mandates that "[a]ll threshold determinations shall be documented in: (a) A determination of nonsignificance (DNS) (WAC 197-11-340) or (b) A determination of significance (DS) (WAC 197-11-360)." There is nothing in SEPA or its implementing regulations requiring SEPA officials to explicitly cite WAC 197-11-350 or to call the document an MDNS when it contains mitigating conditions that bring it below the threshold for a DS. Here, the Birch Street DNS must have been issued pursuant to the MDNS process because it contained mitigating measures under SEPA. It stated that "[t]he proposal would generally take the form described as Alternative 3, Cluster Development, Version C, with mitigation as defined in the Birch Street Residential Subdivision Draft Environmental Assessment."

Moreover, appellants' argument that the DNS could not have been issued pursuant to WAC 197-11-158 reveals a

---

[35] SETTLE, *supra*, § 13(d)(vi) at 139.

[36] *Anderson v. Pierce County*, 86 Wn. App. 290, 303-04, 936 P.2d 432 (1997).

[37] Counsel for Concerned Citizens phrased the issue during closing argument as follows: "[I]s it possible to simply fashion [a DNS] by staff's insistence on certain conditions so that an EIS is completely eliminated? That's what this case is about. Can they do that? Or is an EIS required by the law in these cases where a significant adverse environmental impact is inherent in the project, to wit: *Norway Hill*. I mean, the similarities in this case are amazing."

fundamental misunderstanding of that regulation. WAC 197-11-158(1) authorizes GMA counties or cities to determine that the requirements for environmental analysis, protection and mitigation in its development regulations, comprehensive plan, and other applicable laws or rules provide adequate analysis of and mitigation for some or all of the project's adverse impacts. When all of a project's impacts are addressed by other applicable laws, and no conditions will be required under SEPA, the following statement must be placed in the threshold determination:

> The lead agency has determined that the requirements for environmental analysis, protection, and mitigation measures have been adequately addressed in the development regulations and comprehensive plan adopted under chapter 36.70A RCW, and in other applicable local, state, or federal laws or rules, as provided by RCW 43.21C.240 and WAC 197-11-158. Our agency will not require any additional mitigation measures under SEPA.[38]

According to appellants, the City's failure to include this language in the DNS, combined with the fact that the DNS imposed additional mitigation measures, indicates that all of the project's adverse environmental impacts were not analyzed and mitigated. But WAC 197-11-158 expressly authorizes the use of existing plans, regulations, and laws for analysis and mitigation of *"some* or *all"* impacts. Appellants are clearly mistaken in believing that WAC 197-11--158 applies only where *all* of the impacts can be addressed by existing plans and rules. WAC 197-11-158 creates a flexible process whereby SEPA officials are authorized to rely as much as possible on existing plans, rules and regulations, filling in the gaps where needed by imposing mitigation measures under SEPA. It is not an all-or-nothing proposition, as characterized by appellants.

Here, the EA added mitigation measures which were incorporated by reference into the DNS. WAC 197-11--158(2)(d) requires that the statement cited above be placed

---

[38] WAC 197-11-158(2)(d).

in the DNS only when "no conditions will be required under SEPA." There is no corresponding statement to be placed in the DNS where the agency chooses to impose additional mitigation measures under SEPA, nor even a requirement that the agency expressly refer to WAC 197-11-158 in the DNS. Therefore, the WAC 197-11-158(2)(d) language did not belong in the DNS. Similarly, the DNS did not need to refer to the EIS prepared for the comprehensive plan. WAC 197-11-158(6) states that "nothing in this section requires review of the adequacy of the environmental analysis associated with the comprehensive plans and development regulations that are being relied upon to make [a threshold determination]." The applicable statutes and regulations require that the project be consistent with the comprehensive plan and development regulations, not the underlying EIS.

We next consider whether there are any facts in the record indicating that the DNS was clearly erroneous. "For the MDNS to survive judicial scrutiny, the record must demonstrate that 'environmental factors were considered in a manner sufficient to amount to prima facie compliance with the procedural requirements of SEPA,' and that the decision to issue an MDNS was based on information sufficient to evaluate the proposal's environmental impact."[39]

The record indicates that the project received a great deal of review. The environmental checklist was apparently deemed insufficient, and therefore the SEPA official asked for additional information in the form of an EA. The City gathered extensive comments from agencies and the public, held numerous public meetings, and imposed additional mitigation measures on the project before finally approving it. Notably, although appellants complain generally that the impacts were not adequately analyzed, they have failed to cite any facts or evidence in the record demonstrating that the project as mitigated will cause significant environ-

---

[39] *Anderson*, 86 Wn. App. at 302 (quoting *Pease Hill Cmty. Group v. County of Spokane*, 62 Wn. App. 800, 810, 816 P.2d 37 (1991)).

mental impacts warranting an EIS.

We note, however, that the timing of the DNS is troubling. Spens issued the DNS, and three weeks later recommended that the project as described and mitigated in the DNS be rejected. This triggered more public meetings and review. Ultimately, the project as approved contained many more mitigation measures than the project as presented in the DNS. There is some evidence suggesting that Spens may have anticipated issuing a DNS even before he saw the EA.[40] It is possible that Spens realized at the time he issued the DNS that the project needed more mitigation, but that he was confident that there was enough environmental information to address those matters without an EIS. It is also possible that he thought the project as conditioned in the DNS did contain enough mitigating measures to bring it under the threshold for EIS preparation. In his staff report recommending rejection of the project, he stated that it was "technically and legally feasible with variances, [but] it is not consistent with the neighborhood character and is not socially acceptable." Perhaps he felt constrained by timing requirements. WAC 197-11-310(3) requires the responsible official to make the threshold determination 90 days after the project application and supplemental documents are complete. Pennbrook's application was deemed complete on January 12, 1999, and the DNS was issued on April 2.

The problem with Spens' approach is that the MDNS process and WAC 197-11-158 focus on mitigating impacts before a threshold determination is made, not after. WAC 197-11-158(2) states that "[i]n making the [threshold] determination," the SEPA official may determine that the adverse environmental impacts of the project have been adequately addressed by existing plans and regulations by "[a]voiding or otherwise mitigating the impacts" and condi-

---

[40] In a March 1, 1999 letter to the environmental consultants for the project, written before the EA was completed, Spens indicated that he had reserved both the April 8 and April 22 planning commission meeting dates for the project hearings. Such hearings before the planning commission would be required only if Spens decided to issue a DNS.

tioning the project on compliance with those mitigation measures. The local government may not impose additional mitigation under chapter 43.21C RCW for impacts that have been adequately addressed by existing plans and rules.[41] As discussed previously, this does not prevent decision makers from imposing additional mitigation measures under SEPA through the MDNS process. But WAC 197-11-350 states that "[t]he purpose of this section is to allow clarifications or changes to a proposal *prior to* making the threshold determination." (Emphasis added.) While Spens was entitled to rely on both WAC 197-11-158 and the MDNS process to determine that the project as mitigated would fall below the threshold for EIS preparation, the DNS should not have been issued until the project proposal was properly conditioned.

Although the DNS was issued prematurely, it is difficult to see how the appellants were prejudiced. The city council imposed many additional mitigation measures on the project before approving it, thereby making it more environmentally friendly than the version in the DNS. Appellants suggest that the DNS misled the city council into believing that all of the impacts were capable of mitigation, but the record indicates that the project received a considerable degree of scrutiny. Furthermore, WAC 197-11-350 requires an EIS where a proposal continues to have a significant adverse environmental impact, even with mitigation measures. While all of the required mitigation measures should have been imposed before the DNS was issued, the appellants still have not shown that the approved project, as it was mitigated, remains above the significance threshold.

Although the statutes and regulations do not expressly require that the DNS explicitly refer to WAC 197-11-350 or WAC 197-11-158, such references would be extremely helpful to litigants and courts. In this case, appellants' claims were based primarily on their assertion that Spens could

---

[41] WAC 197-11-158(5).

not have relied on either of those regulations in issuing the DNS. Making a clear reference to those regulations in issuing threshold determinations would allow project challengers to better focus their arguments and would facilitate appellate review.

Lastly, appellants are correct that more than mere consistency with the comprehensive plan and development regulations is required to avoid EIS preparation. WAC 197-11-158 and WAC 197-11-350 also require that the specific adverse environmental impacts of the project be adequately mitigated. In this respect, the trial court may have gone too far in suggesting that an EIS would be required only for a completely different land use than that discussed in the comprehensive plan:

> Now, there are cases where a specific development proposal would be so far different from the existing uses permitted under the comprehensive plan that a brand new full [EIS] may be required because of the difference that that project has in relation to what has already been approved through the SEPA process there, the comprehensive plan. For example, if an area designated for urban growth and residential development, as this area was, if a developer were to come in and say we want to put in a power plant, and they look for rezoning, and they look for approval of that plan, then clearly the existing SEPA process that was utilized previously is so out of line with what is being proposed that a brand new assessment from the inception and an EIS would have to be done.

But because appellants do not contend that the project is inconsistent with the comprehensive plan and development regulations, these comments ultimately have no bearing on the outcome of the case.

### III

Procedural Challenges

 Under LUPA, the standard for reviewing procedural errors is whether "[t]he body or officer that made the land use decision engaged in unlawful procedure or failed to

follow a prescribed process, unless the error was harmless."[42] Issues raised under this subsection are questions of law, reviewed de novo.[43]

■■■ Appellants argue that the trial court erred in finding that they failed to prove that the City did not comply with SEPA notice requirements for issuing a DNS. Appellants contend that the City failed to mail the DNS to the Department of Ecology (DOE) as required by WAC 197-11-340(2)(b).[44] The sole evidence they submitted in support of their claim is the absence of an entry for the DNS in the SEPA register. They argue that this evidence was sufficient to meet the minimal burden of proving a negative.[45] But such proof must " 'be at least sufficient to render the existence of the negative probable, or to create a fair and reasonable presumption of the negative until the contrary is shown.' "[46] Here, the fact that the DOE did not enter the DNS in its SEPA register is insufficient to create a presumption that it was not mailed to DOE. The City provided evidence that the DNS was mailed to DOE. The omission could have been a clerical error on DOE's part. It is DOE's responsibility to enter threshold determinations in the SEPA register.[47] Other agencies on the City's mailing list did respond to the notice. The trial court did not err in refusing to infer that the City was responsible for this procedural error.

Next, appellants argue that because the City failed to mail the DNS to DOE, and the DNS was not published in

---

[42] RCW 36.70C.130(1)(a).

[43] *Schofield v. Spokane County*, 96 Wn. App. 581, 586, 980 P.2d 277 (1999).

[44] WAC 197-11-340(2)(b) states that "[t]he responsible official shall send the DNS and environmental checklist to agencies with jurisdiction, the department of ecology, and affected tribes, and each local agency or political subdivision whose public services would be changed as a result of implementation of the proposal, and shall give notice under WAC 197-11-510."

[45] *Higgins v. Salewsky*, 17 Wn. App. 207, 210-11, 562 P.2d 655 (1977).

[46] *Higgins*, 17 Wn. App. at 211 (quoting 30 Am. Jur. 2d *Evidence* § 1163, at 338 (1967)).

[47] WAC 197-11-508(1).

the SEPA register, the comment period never began to run and members of the public were deprived of notice.[48] WAC 197-11-340(2)(c) provides for comment on the DNS for 14 days after issuance of the DNS, and WAC 197-11-340(2)(d) provides that the DNS is issued on the date it is sent to DOE and made publicly available. But, as discussed above, the appellants did not meet their burden of proving that the City did not mail the DNS to DOE. The parties were not aware that the DNS had not been published in the SEPA register until after the City's project review process was over.

 Next, appellants contend that the City committed a procedural violation by "adopting" the EA "by reference" in the DNS. Appellants' claim is based on a misreading of the applicable regulations. WAC 197-11-600 authorizes agencies, under certain circumstances, to use existing documents to meet all or part of their SEPA responsibilities. One method of accomplishing this is "adoption," whereby an agency independently reviews the document, determines that it meets the agency's environmental review standards and needs, ensures that it is readily available to the public, and follows adoption notice procedures.[49] However, agencies are not required to formally "adopt" existing environmental documents to meet SEPA requirements when acting on the same proposal for which an environmental document was prepared.[50] Instead, they may choose to simply incorporate the document by reference.[51] The procedure for incorporation by reference is much simpler than for adoption. Contrary to appellants' characterization of the matter,

---

[48] WAC 197-11-340(2)(c) provides that "[a]ny person, affected tribe, or agency may submit comments to the lead agency within fourteen days of the date of issuance of the DNS." WAC 197-11-340(2)(d) provides that "[t]he date of issue for the DNS is the date the DNS is sent to the department of ecology and agencies with jurisdiction and is made publicly available."

[49] WAC 197-11-630, -665.

[50] WAC 197-11-600(4)(a).

[51] WAC 197-11-600(4)(b). WAC 197-11-635(2) provides that "[m]aterial incorporated by reference (a) shall be cited, its location identified, and its relevant content briefly described; and (b) shall be made available for public review during applicable comment periods."

there is no such thing as "adoption by reference." "Adoption" and "incorporation by reference" are two separate means to use existing environmental documents in the SEPA process. Here, the EA was specifically prepared for the Birch Street project in response to Spens' request for additional information. The City relied on the EA to issue the DNS. Accordingly, the City properly employed the procedure for "incorporation by reference" by specifically citing the EA in the DNS and making it available to the public.

Finally, appellants contend that even if this was a mitigated DNS, an EIS was still required because of the enormous adverse environmental impact of this large subdivision. WAC 197-11-350(2) mandates that an EIS shall be prepared if a proposal continues to have probable significant adverse impacts, even with mitigation measures. But as discussed above, appellants have not pointed to any specific facts or evidence demonstrating that the project as mitigated has significant environmental impacts requiring an EIS.

Even if appellants were to prevail on any of their procedural claims, they have not demonstrated prejudice, as required by LUPA.[52] They received notice of the DNS and challenged it extensively before the planning commission and city council. And they do not have standing to assert the interests of DOE or other agencies.

## IV

RCW 4.84.370 governs fee awards for appeals of land use decisions. The statute provides that "reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals" for a local government's decision to issue, condition, or deny a development permit.[53] The court shall

---

[52] LUPA requires that "another person aggrieved or adversely affected by the land use decision" must demonstrate that the decision has prejudiced or is likely to prejudice that person. RCW 36.70C.060(2)(a).

[53] RCW 4.84.370(1).

award fees and costs if the prevailing party on appeal was also the prevailing party (a) before the local government or (b) in all prior judicial proceedings.

Here, Pennbrook was the prevailing party before the city council and the trial court. Because we hold that Pennbrook prevails on appeal, an award of reasonable attorney fees and costs to Pennbrook is mandatory. These fees and costs are to be paid by appellants Larry Moss, Michael Frome and Concerned Citizens of Park Ridge.[54]

The effects of SEPA regulatory reform, combined with the MDNS process, have created a flexible, streamlined process which allows decision makers to rely as much as possible on existing plans and rules in meeting SEPA's procedural requirements. The SEPA official issued the DNS prematurely, before all of the necessary mitigation measures were in place. But appellants have not pointed to any facts or evidence in the record showing that the project, as mitigated, will have significant environmental impacts requiring an EIS. Furthermore, we find no reversible procedural errors. Because Pennbrook prevailed below, it is entitled to attorney fees.

Affirmed.

AGID, C.J., and APPELWICK, J., concur.

Reconsideration denied November 14, 2001.

Review denied at 146 Wn.2d 1017 (2002).

---

[54] Appellants proceeded pro se at oral argument in this court after their attorney below, Roger Ellingson, withdrew due to nonpayment of fees. There is nothing in the record indicating that any of the individual appellants withdrew; therefore, all appellants of record are liable for Pennbrook's fees and costs.