# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ESCALA OWNERS ASSOCIATION, | ) | No. 82568-2-I |
| | ) | |
| Respondent/Cross-Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE, SEATTLE | ) | |
| DOWNTOWN HOTEL & | ) | |
| RESIDENCE LLC, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellants/Cross-Respondents. | ) | |
| | ) | |

MANN, J. — This case is about the City of Seattle's review and approval of a 54-story mixed use building in the downtown core (project) proposed by Downtown Hotel and Residences, LLC (Applicant). We are asked to determine whether the City's review process complied with Washington's State Environmental Policy Act of 1971 (SEPA), ch. 43.21C RCW.

The City and Applicant (collectively City)[1] appeal a decision by the King County Superior Court reversing the City hearing examiner's determination that the City complied with the SEPA. The City argues that: (1) it properly adopted an existing 2005

_____

[1] While recognizing that the City of Seattle and Downtown Hotel & Residences LLC are separate appellants and cross-respondents, for clarity this opinion refers to them collectively as the "City."

environmental impact statement (Downtown EIS) as part of its SEPA review, (2) it properly relied on a September 2017 SEPA addendum (Addendum) to supplement the earlier Downtown EIS, (3) the hearing examiner correctly concluded that a supplemental environmental impact statement (SEIS) was not required, and (4) that the combined Downtown EIS and Addendum were adequate.

Escala Owners Association (Escala), the petitioners below, cross appeal, arguing that the hearing examiner erred by dismissing its SEPA claims involving transportation impacts.

We agree with the City and reverse the superior court. We affirm the hearing examiner's conclusion that the City complied with SEPA. We also affirm the hearing examiner's conclusion that Escala's SEPA claims involving transportation impacts are barred by RCW 43.21C.501.[2]

## I. SEPA PROCESS

Before addressing the facts specific to this case, we first provide a brief overview of the SEPA process. SEPA requires the analysis and disclosure of probable significant environmental impacts of a proposal. WAC 197-11-060(4). A proposal may either be a particular development proposal (a project action), or a legislative or policy change (a nonproject action). WAC 197-11-704. The first step in the SEPA process is for an agency to determine whether a proposal will "significantly [affect] the quality of the environment." RCW 43.21C.030(c). This step is known as a "threshold determination." RCW 43.21C.033; WAC 197-11-310. A threshold determination produces either a

_____

[2] On September 23, 2021, this court linked Escala's appeal to that of another proposed project on the same block. See Escala Owners Association v. City of Seattle, No. 83037-6-I (Wash. Ct. App. July 25, 2022).

determination of significance (DS) or a determination of nonsignificance (DNS). WAC 197-11-310(5).

If an agency determines that a proposal may have significant adverse environmental impacts, it issues a DS. WAC 197-11-360. Issuance of a DS triggers the requirement that the agency prepare an environmental impact statement (EIS) that includes an analysis of alternatives to the proposal. RCW 43.21C.030; WAC 197-11-736. If an agency determines that a proposal will not significantly affect the environment, it issues a DNS and an EIS is not required. WAC 197-11-340.[3]

Preparing an EIS requires several steps. The agency first invites public comments on the scope of the EIS. Scoping involves identifying probable significant adverse impacts and reasonable alternatives. WAC 197-11-408. The agency then prepares a draft EIS that must be circulated to the public and affected agencies for comment. WAC 197-11-400 to -455; WAC 197-11-460; WAC 197-11-500 to -550. The agency must then prepare a final EIS that addresses and responds to the comments received. WAC 197-11-560.

Instead of preparing a new EIS for every proposal, an agency may also rely on "existing environmental documents," including an EIS prepared for an earlier proposal, to provide analysis. RCW 43.21C.034; WAC 197-11-600. SEPA allows adoption of existing environmental documents where the proposal currently being reviewed is either the same as, or different than, the proposal previously analyzed. WAC 197-11-600(2). If additional analysis is necessary, the agency can prepare an addendum "that adds

---

[3] While not relevant here, an alternative threshold determination is the "mitigated determination of non-significance," or "MDNS," which involves changing or conditioning a project to eliminate its significant adverse environmental impacts. WAC 197-11-350. With a MDNS, promulgation of a formal EIS is not required.

analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing document." WAC 197-11-600(4)(c). The agency must prepare a SEIS if there are "substantial changes so that the proposal is likely to have significant environmental impacts," or "new information indicating a proposal's probable significant adverse environmental impacts." WAC 197-11-600(4)(d).

## II. FACTS

### A. Downtown EIS

In January 2005, the City issued an EIS for a nonproject proposal to change zoning requirements for a portion of the downtown office core (Downtown EIS). Along with a "no action alternative," the Downtown EIS examined four alternatives that allowed for a significant increase in height and density for downtown development. The EIS identified and analyzed a range of environmental impacts that could arise from an increase in density. Topics addressed included growth policy and planning, housing, open space, historic preservation, height, bulk, scale, shadows, population, employment, transportation, parking, and energy impacts. The Downtown EIS recognized that the change in zoning would result in a major change to downtown land uses:

> Under all alternatives if forecasted development occurs, land uses in the study area would be significantly transformed by the increased density of residential and commercial development. This transformation is interpreted to be consistent with the City's Comprehensive Plan and neighborhood plans for the study area and is not interpreted to be a significant unavoidable adverse impact.

After issuance of the Downtown EIS, the City adopted new zoning for the downtown core consistent with the preferred alternative considered in the EIS. The

zoning for the area at issue was changed to Downtown Office Core 2 (DOC 2) which allows a maximum height of 550 feet for structures with residential uses. SMC 23.49.008.A.3.

B. Escala Condominiums

After the zoning change, in 2009, construction of the Escala Condominiums was completed. Escala is a 30-story residential tower at the corner of 4th Avenue and Virginia Street. An alley runs behind Escala, connecting Virginia and Stewart Streets and bisecting the block bounded by 4th and 5th Avenues. Escala residents rely on the alley for delivery services, emergency services, and for waste and recycling collection services. The location of Escala at 1920 4th Avenue is shown below. The alley is shown bisecting 4th and 5th Avenue.



C. The Project

In 2014, the Applicant proposed building a 49-story mixed use building with a hotel, apartment units, underground parking, and retail stores, at 5th Avenue and Stewart Street (project). The dot identifies the project location on the above sketch.

Under the proposal, hotel guests would access the parking garage from 5th Avenue. All other vehicular access to the building would be through the alley shared with Escala. Apartment residents would access parking in the alley at the northwest corner of the building; one of three loading bays in the middle of the building off the alley would receive delivery trucks.[4]

Construction of the project depends on receiving a master use permit administered by the Seattle Department of Construction and Inspections (Department). The Department determined that the project would need two approvals: (1) SEPA review to evaluate the project's environmental impacts and (2) design review, which evaluates a project's compliance with the Department's guidelines related to design. A project that is approved under the design review process is presumed to comply with the City's SEPA height, bulk, and scale policies. SMC 25.05.675(G)(2)(c).

After undergoing design review before the City's design review board, the applicant revised the project, increasing the height to 54 stories. On September 14, 2017, the Department issued a revised notice of application addressing SEPA review. The notice stated that the Department had adopted the Downtown EIS and a SEPA Addendum and:

> Determined that the referenced proposal is likely to have probable significant adverse environmental impacts under [SEPA] on the land use, environmental health, energy/greenhouse gas emissions, aesthetics (height, bulk, and scale; light, glare and shadows, views), wind, historic and cultural resources, transportation and parking and construction elements of the environment.

---

[4] In addition to this project, the City has also approved another 48-story building with residential units, hotel rooms, and retail space on the same block (Fifth and Virginia project). The Fifth and Virginia Project will have a loading dock in the alley shared by Escala and this project. On September 23, 2021, this court linked Escala's appeal of the Fifth and Virginia project, to this matter for the purpose of oral argument. It is the subject of a separate opinion. See Escala Owners Association v. City of Seattle, No. 83037-6-I (Wash. Ct. App. July 25, 2022).

> [The Department] has identified and adopts the City of Seattle's [2005 Downtown EIS]. This [Downtown EIS] meets [the Department's] SEPA responsibility and needs for the current proposal and will accompany the proposal to the decision-maker.
>
> The Addendum has been prepared by the applicant to add specific information on the land use, environmental health, energy/greenhouse gas emissions, aesthetics (height, bulk and scale, light, glare and shadows, views), wind, historic and cultural resources, transportation and parking and construction elements of the environment from the proposal and discusses changes in the analysis in the referenced [Downtown EIS]. Pursuant to SMC 25.05.625-.630, this addendum does not substantially change analysis of the significant impacts and alternatives in the [Downtown EIS].

The notice explained how the public could obtain the relevant documents, and began a two-week public comment period. On October 9, 2017, the Department extended the public comment period another two weeks.

Over the next two years, the Department considered the public comments and additional environmental analysis prepared by the Applicant. On August 5, 2019, the Department issued a revised notice that contained the same language as the original September 2017 notice, except striking the words "is likely to" and instead stating that it determined that the project "could" have probable significant adverse impacts on the environment.

On October 10, 2019, the Department issued its analysis and decision (decision). The decision addressed the City's design review approval and SEPA review. The decision explained the Department's rationale for adopting the Downtown EIS:

> The subject site lies within the geographic area analyzed in [the Downtown EIS]. Potential impacts from the project proposed here are within the range of significant impacts that were evaluated in that [Downtown EIS]. Therefore, as authorized by State and local SEPA rules, [the Department determined that it should adopt [the Downtown EIS].

The decision also explained the Department's adoption of the September 2017 Addendum:

> In addition, an Addendum to [the Downtown EIS] . . . has been prepared to add more project-specific information and identify and analyze new potential environmental impacts from the proposed project.
>
> The Addendum adds analysis or information about the proposal and does not substantively change the analysis of significant impacts and alternatives in the [Downtown EIS]. The project produces no probable, significant, adverse environmental impacts that were not already studied in the [Downtown EIS].

D. Administrative Appeal

Escala appealed both the SEPA decision and design review decision to the City's hearing examiner. The hearing examiner denied the appeal, upholding the Department's decisions. The hearing examiner also dismissed Escala's SEPA claims involving transportation impacts, holding that they were exempt from appeal under RCW 43.21C.501.[5]

On May 26, 2020, Escala filed a land use petition before the King County Superior Court. On March 23, 2021, the superior court determined that the hearing examiner erred in upholding the project's SEPA review and remanded for preparation of an SEIS. The court affirmed the hearing examiner's dismissal of Escala's SEPA claims involving transportation impacts.

The City appeals the superior court's decision and challenges its conclusion that the hearing examiner erred in upholding the adequacy of the City's SEPA analysis.

---

[5] The hearing examiner and both parties incorrectly cite RCW 43.21C.501 as RCW 43.21C.500. RCW 43.21C.501 was erroneously codified as RCW 43.21C.500. RCW 43.21C.500 expired June 30, 1995, and appears in the Disposition of Former RCW Sections. Section 6, chapter 348, Laws of 2019 is now codified as RCW 43.21C.501.

Escala cross appeals the superior court's decision affirming the hearing examiner's dismissal of Escala's SEPA claims involving transportation impacts.

III. <u>ANALYSIS</u>

A. <u>SEPA Compliance</u>

The City argues that the trial court erred in reversing the hearing examiner's decision that the City complied with SEPA. The City contends that: (1) it properly adopted the Downtown EIS, (2) that it properly relied on an addendum as part of its SEPA review, (3) that a supplemental EIS was not required to satisfy SEPA, and (4) that the combined 2005 FEIS and addendum are adequate. We agree.

1. <u>Standard of Review</u>

This matter is before us under the Land Use Petition Act (LUPA), ch. 36.70C RCW. In reviewing a LUPA decision, we sit in the same position as the superior court and apply the LUPA standards of review directly to the hearing examiner's decision. <u>Wenatchee Sportsmen Ass'n v. Chelan County</u>, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). Our review is confined to the record created before the hearing examiner. RCW 36.70C.120(1).

Under LUPA, "a court may grant relief from a local land use decision only if the party seeking relief has carried the burden of establishing that one of six standards listed in RCW 36.70C.130(1) has been met." <u>Wenatchee Sportsmen</u>, 141 Wn.2d at 175. Because Escala seeks relief from the Department and hearing examiner's decision, it bears the burden on appeal. <u>Pinecrest Homeowners Assn v. Cloninger &</u>

Assocs., 151 Wn.2d 279, 288, 87 P.3d 1176 (2004).[6]  The relevant standards of review

include:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1)(b)-(d).

 "We review the agency's factual findings under the substantial evidence

standard and conclusions of law de novo."  Wenatchee Sportsmen, 141 Wn.2d at 176.

Substantial evidence is "a sufficient quantum of evidence in the record to persuade a

reasonable person that the declared premise is true."  Wenatchee Sportsmen, 141

Wn.2d at 176.  We review an application of facts to the law under the clearly erroneous

standard.  Wenatchee Sportsmen, 141 Wn.2d at 176.  Such an application is clearly

erroneous when, despite supporting evidence, "the reviewing court on the record is left

with the definite and firm conviction that a mistake has been committed."  Wenatchee

Sportsmen, 141 Wn.2d at 176.

### 2.  Adoption of the Downtown EIS

The City argues first that the hearing examiner correctly concluded that the City

properly adopted the Downtown EIS as part of its SEPA analysis of the project.  We

agree.  The hearing examiner's determination that the City properly adopted the 2005

---

[6] Because it bears the burden on appeal, we have reviewed the arguments included in Escala's reply brief.

FEIS is an application of law to facts subject to the "clearly erroneous" standard of review. RCW 36.70C.130(1)(d).

As discussed briefly above, SEPA contemplates using existing SEPA documents for subsequent proposals. "To avoid 'wasteful duplication of environmental analysis and to reduce delay,' the SEPA rules encourage and facilitate reusing existing environmental documents." Thornton Creek Legal Defense Fund v. City of Seattle, 113 Wn. App. 34, 50, 52 P.3d 522 (2002) (quoting RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 15, at 209 (2001)). "Under certain circumstances, 'existing documents may be used to meet all or part of an agency's responsibility under SEPA.'" Thornton Creek, 113 Wn. App. at 50 (quoting SMC 25.05.600(A)). SEPA authorizes the use of existing documents under these circumstances:

> Lead agencies are authorized to use in whole or in part existing environmental documents for new project or nonproject actions, if the documents adequately address environmental considerations set forth in RCW 43.21C.030. The prior proposal or action and the new proposal or action need not be identical, but must have similar elements that provide a basis for comparing their environmental consequences such as timing, types of impacts, alternatives, or geography. The lead agency shall independently review the content of the existing documents and determine that the information and analysis to be used is relevant and adequate. If necessary, the lead agency may require additional documentation to ensure that all environmental impacts have been adequately addressed.

RCW 43.21C.034.

Under the SEPA rules, "an agency may use environmental documents that have previously been prepared in order to evaluate proposed actions, alternatives, or environmental impacts." WAC 197-11-600(2). "The proposals may be the same as, or different than, those analyzed in the existing document." WAC 197-11-600(2); SMC

25.05.600(A). The Seattle Municipal Code also requires that the earlier document need be "accurate and reasonably up-to-date." SMC 25.05.600.

The SEPA rules provide that existing environmental documents may be used for a new proposal by adoption, incorporation by reference, incorporating an addendum, or preparing a supplemental EIS:

> (4) Existing documents may be used for a proposal by employing one or more of the following methods:
>
> (a) "Adoption," where an agency may use all or part of an existing environmental document to meet its responsibilities under SEPA. Agencies acting on the same proposal for which an environmental document was prepared are not required to adopt the document; or
>
> (b) "Incorporation by reference," where an agency preparing an environmental document includes all or part of an existing document by reference.
>
> (c) An addendum, that adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document.
>
> (d) Preparation of a SEIS if there are:
>
> (i) Substantial changes so that the proposal is likely to have significant adverse environmental impacts; or
>
> (ii) New information indicating a proposal's probable significant adverse environmental impacts.
>
> (e) If a proposal is substantially similar to one covered in an existing EIS, that EIS may be adopted; additional information may be provided in an addendum or SEIS (see (c) and (d) of this subsection).

WAC 197-11-600(4).

Escala asserts that the Downtown EIS could not be adopted because the rezoning analysis under consideration in the EIS does not properly analyze the site-specific impacts of the project. Escala is incorrect. The City could adopt the Downtown EIS if it had similar elements that provide a basis for comparing their environmental consequences such as timing, types of impacts, alternatives, or geography. RCW 43.21C.034. The hearing examiner determined that the Downtown EIS contained similar elements.

The hearing examiner found that the Downtown EIS "evaluated the probable significant environmental impacts that could result from the development, following a change in zoning to allow additional height and density in the Downtown area." The examiner also found that the project would have potential significant impacts within the range of those evaluated in the Downtown EIS including impacts on land use, aesthetic height, bulk, and scale, light and glare, and transportation. Further, "the site of the proposal [was] within the same geographic area analyzed in the [Downtown EIS]." Finally, the hearing examiner noted that the Department required the Applicant to submit the Addendum to ensure that the project would produce no probable significant impacts not addressed by the Downtown EIS. Based on these findings, the hearing examiner concluded that the Downtown EIS:

> provided environmental analysis for the upzone of the Downtown District. The rezone established the zoning under which the project application was submitted, establishing the provisions that specifically allow for the proposal. The [Downtown EIS] specifically anticipated projects of the type represented by the proposal.

The hearing examiner's conclusion is consistent with SEPA's requirement that a previous EIS may be adopted where the new proposal is consistent in timing, types of impacts, alternatives, or geography. RCW 43.21C.034. The hearing examiner's conclusion is supported by substantial evidence.

The approach taken by the City is like that considered by this court in Thornton Creek. In Thornton Creek, the court considered a site specific "General Development Plan" (GDP) proposed for a site (the Northgate Mall) within the larger Northgate "urban center." 113 Wn. App. at 43. The City's previous decision to designate Northgate as an urban center was reviewed in a nonproject EIS in 1992. Thornton Creek, 113 Wn. App.

at 43-44. When considering the newer proposal, the City determined that the GDP was within the scope of the plans analyzed in the prior urban center EIS, and adopted the older EIS along with an addendum to satisfy SEPA. Thornton Creek, 113 Wn. App. at 43-44. We affirmed the City's approach concluding that sufficient similarity existed between the nonproject EIS and the GDP because "the proposals included in the GDP fell within the scope of development analyzed in [the] existing] EIS" and "the environmental impact of the GDP was not substantially different from that analyzed in [the EIS]." Thornton Creek, 113 Wn. App. at 51.

Much like in Thornton Creek, the hearing examiner reviewed the Department's decision and determined that the Downtown EIS specifically addressed the scope and impact of development like the project for the same geographic area. This hearing examiner's decision affirming the City's adoption of the Downtown EIS was not clearly erroneous.

### 3. Addendum vs. Supplemental EIS

The City next argues that the hearing examiner accurately concluded that the City properly relied on the Addendum as part of its SEPA analysis of the project and that a SEIS was not required. We agree. Because the hearing examiner's determination that the City properly relied on the Addendum is an application of law to facts, it is subject to the "clearly erroneous" standard of review. RCW 36.70C.130(1)(d).

The SEPA rules provide that when an agency adopts or incorporates existing SEPA documents into its SEPA review, addenda, and supplemental EISs may be prepared to remedy shortcomings in the documents that have been used. WAC 197-11-600(4)(a), (d); SMC 25.05.600(D)(3), (4). An addendum is the appropriate vehicle

-14-

for adding analyses or information about a proposal that "adds analyses or information about a proposal but does not substantially change the analysis of significant impacts and alternatives in the existing environmental document." WAC 197-11-600(4)(c); SMC 25.05.600(D)(3).

By contrast, an agency must prepare an SEIS if there are "[s]ubstantial changes so that the proposal is likely to have significant adverse environmental impacts," or if there is "[n]ew information indicating a proposal's probable significant adverse environmental impacts." WAC 197-11-600(4)(d)(i), (ii); SMC 25.05.600(D)(4)(a), (b).

The Addendum addressed the following impacts: land use, environmental health, energy/greenhouse gas emissions, aesthetics (height, bulk, and scale, light/glare/shadows, and viewshed), historical resources, wind, transportation, circulation and parking, and construction. Following review of the Downtown EIS and the Addendum, the Department determined that, consistent with WAC 197-11-600(4)(c), the impacts addressed by the Addendum did not substantially change the analysis of significant impacts and alternatives considered in the Downtown EIS.

Citing Thornton Creek and the Seattle Municipal Code, the hearing examiner rejected Escala's argument that the Addendum was neither allowed nor sufficient. The hearing examiner considered and discussed the analysis included in the Downtown EIS and Addendum relating to land use, aesthetics, height, bulk, and scale, light and glare, and transportation. Based on their review, the hearing examiner concluded that Escala had failed to meet its burden to present actual evidence of probable significant impacts—instead arguing only procedural bars. The hearing examiner correctly noted that it was commonplace to adopt existing environmental documents and supplement

them to adequately address any additional topics; such adoption is permitted by both the language of SEPA and the rules governing its implementation. The hearing examiner's approval of the Addendum was not clearly erroneous.

    4.  Adequacy of Downtown EIS

Escala contends that even if the City were allowed to adopt the Downtown EIS, it is still inadequate because it fails to contain information required by SEPA. We disagree.

Escala's primary contention appears to be that the City's decision adopting the Addendum rather than preparing a SEIS thwarts the public's right to consider alternatives in the project's design. We agree with Escala that an alternatives analysis is one of the key building blocks, if not the heart of SEPA. SEPA requires that an EIS identify and assess the impacts of reasonable alternatives to the proposal, including the no action alternative. RCW 43.21C.030. "The required discussion of alternatives to a proposed project is of major importance, because it provides a basis for a reasoned decision among alternatives having differing environmental impacts." Weyerhaeuser v. Pierce County, 124 Wn.2d 26, 38, 873 P.2d 498 (1994).

Escala's argument here, however, ignores that the requirement for an alternatives analysis is only triggered where a new EIS or SEIS is required. There is no dispute that an EIS must include an analysis of alternatives including the no action alternative. See WAC 197-11-400 (EIS shall inform decision makers and the public of reasonable alternatives); WAC 197-11-402 (EIS need analyze only the reasonable alternatives); WAC 197-11-440(5) (requirement for alternatives in EIS). There is also no dispute that where a SEIS is required, it must include alternatives if they were not

considered in the previously prepared EIS. WAC 197-11-620; WAC 197-11-440. But, contrary to Escala's argument, there is no similar requirement for an analysis of alternatives when preparing an addendum. See WAC 197-11-625.

Similar to its argument about the lack of alternatives, Escala argues that the Downtown EIS failed to include additional EIS requirements including: (1) a summary of the project, (2) an analysis of the affected environment for the project, and (3) an adequate analysis of the environmental impacts caused by the project. Escala's argument focuses only on the contents of the Downtown EIS and ignores that the analysis it claims is missing in the Downtown EIS was included in the Addendum. Contrary to Escala's arguments, this is precisely the purpose of an addendum—adding analysis or information about a proposal that was not included in the original adopted EIS. WAC 197-11-600(4)(c).

The adequacy of an EIS is a question of law, which this court reviews de novo. Klickitat County Citizens Against Imported Waste v. Klickitat County, 122 Wn.2d 619, 632-33, 860 P.2d 390, 866 P.2d 1256 (1993). In reviewing the adequacy of an EIS, we accord substantial deference to the weight of the governmental agency's determination that an EIS is adequate. RCW 43.21C.090; Klickitat County, 122 Wn.2d at 633.

The adequacy of an EIS focuses on the legal sufficiency of its data. Klickitat County, 122 Wn.2d at 633. We judge adequacy by the "'rule of reason.'" Barrie v. Kitsap County, 93 Wn.2d 843, 854, 613 P.2d 1148 (1980) (quoting Mentor v. Kitsap County, 22 Wn. App. 285, 588 P.2d 1226 (1978)). The "rule of reason" requires a "'reasonably thorough discussion of the significant aspects of the probable

environmental consequences.'" Klickitat County, 122 Wn.2d at 633 (quoting Cheney v. Mountlake Terrace, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976)).

The Downtown EIS extensively examined five alternative legislative zoning proposals that the City was considering at the time, including a no action alternative. The Downtown EIS analyzed an array of impacts of high-density zoning in the downtown Seattle area. In its analysis, the Downtown EIS examined impacts and established provisions that specifically allowed for and anticipated developments like the project and Escala. The entire purpose of the Downtown EIS was to analyze the environmental impacts of changing the downtown office core zoning to allow for the construction of high-density developments in the geographic area where the project and Escala are located. Further, the City recognized the need for additional project specific environmental analysis. To address this need, the City relied on the analysis in the Addendum.

The City's analysis of impacts of development in the Downtown EIS, combined with the Addendum addressing project-specific impacts, meets the rule of reason.

B. Transportation Impacts and RCW 43.21C.501

On cross appeal, Escala argues that the hearing examiner erred as a matter of law in dismissing its SEPA claims involving transportation impacts. We disagree.

The legislature added RCW 43.21C.501 to SEPA in 2019. The provision states:

> (1) A project action pertaining to residential, multifamily, or mixed use development evaluated under this chapter by a city or town planning under RCW 36.70A.040 is exempt from appeals under this chapter on the basis of the evaluation of or impacts to transportation elements of the environment, so long as the project does not present significant adverse impacts to the state-owned transportation system as determined by the department of transportation and the project is:
>   (a)(i) Consistent with a locally adopted transportation plan; or

> (ii) <u>Consistent with the transportation element of a comprehensive plan</u>; and
>> (b)(i) A project for which traffic or parking impact fees are imposed pursuant to RCW 82.02.050 through 82.02.090; or
>> (ii) <u>A project for which traffic or parking impacts are</u> <u>expressly mitigated by an ordinance, or ordinances, of general application adopted by the city or town</u>.
> (2) For purposes of this section, "impacts to transportation elements of the environment" include impacts to transportation systems; vehicular traffic; waterborne, rail, and air traffic; parking; movement or circulation of people or goods; and traffic hazards.

(Emphasis added).

The hearing examiner concluded that the City established that the project was consistent with subsection (a)(ii) and (b)(ii) of RCW 43.21C.501. For subsection (a)(ii), City transportation planner John Shaw testified that the project is consistent with the City's comprehensive plan because it exemplifies the precise development contemplated by the City's transportation policy focusing on density, multimodal transportation options, and pedestrian safety. As for subsection (b)(ii), expert witness and transportation engineer Marni Heffron explained why City ordinances of general application expressly mitigate the alley congestion and resulting issues the project may cause, the primary concerns raised by Escala.

Based on this testimony, the hearing examiner determined that the ordinances cited by the City addressed all impacts raised by Escala and that the project is consistent with both RCW 43.21C.501(a)(ii) and (b)(ii). The hearing examiner's findings are supported by substantial evidence and are not clearly erroneous.

C. <u>Attorney Fees</u>

Both parties request attorney fees on appeal under RAP 18.1. We deny fees to both.

-19-

Under RAP 18.1, a party may request reasonable attorney fees on appeal if an applicable law grants the party the right to recover. Fees and costs for an appeal of a land use decision are determined by RCW 4.84.370:

> (1) Notwithstanding any other provisions of this chapter, reasonable attorneys' fees and costs shall be awarded to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, or similar land use approval or decision. The court shall award and determine the amount of reasonable attorneys' fees and costs under this section if:
> (a) The prevailing party on appeal was the prevailing party or substantially prevailing party before the county, city, or town, or in a decision involving a substantial development permit under chapter 90.58 RCW . . .; and
> (b) The prevailing party on appeal was the prevailing party or substantially prevailing party in all prior judicial proceedings.
> (2) In addition to the prevailing party under subsection (1) of this section, the county, city, or town whose decision is on appeal is considered a prevailing party if its decision is upheld at superior court and on appeal.

An applicant may receive attorney fees under RCW 4.48.370(1) if it prevails in all forums below and is the prevailing party on appeal. Moss v. City of Bellingham, 109 Wn. App. 6, 30, 31 P.3d 703 (2001). "Under [RCW 4.84.370] . . . we award fees to the public entity that made the permitting decision only when the public entity succeeds in defending its decision on the merits."[7] Durland v. San Juan County, 182 Wn.2d 55, 78, 340 P.3d 191 (2014). Because Escala fails on appeal, and because the City did not succeed in defending its decision on the merits before the superior court, we award fees to neither party.

---

[7] Although the trial court upheld the hearing examiner's holding dismissing Escala's SEPA claims involving transportation impacts, the City ultimately did not "defend its decision on the merits" at trial. Thus, we do not award fees for the City's consistent success on this issue.

We reverse the superior court and affirm the hearing examiner's decision.

_____
Mann, J.

WE CONCUR:

_____
Bowman, J.

_____
Appelwick, J.P.T.