[Nos. 47353-1-I; 49131-8-I. Division One. August 12, 2002.]

THORNTON CREEK LEGAL DEFENSE FUND, *Appellant*, v. THE CITY OF SEATTLE, ET AL., RESPONDENTS.

THORNTON CREEK LEGAL DEFENSE FUND, ET AL., *Respondents*, v. THE CITY OF SEATTLE, *Defendant*, SIMON PROPERTY GROUP, *Appellant*.

36

38

*Eric D. "Knoll" Lowney* (of *Smith & Lowney*), for Thornton Creek Legal Defense Fund.

*Jan E. Brucker*, for Citizens for a Livable Northgate.

*Thomas A. Carr, City Attorney*, and *Robert D. Tobin, Assistant*, for the City of Seattle.

*Thomas H. Wolfendale* and *Eric S. Laschever* (of *Preston Gates & Ellis, L.L.P.*), for Simon Property Group.

AGID, J. — This case involves a challenge to the City of Seattle's approval of General Development Plans (GDPs) for the future expansion of Northgate Mall. In 1993, the City designated Northgate Mall and the surrounding area as one of Seattle's "urban centers," adopting the Northgate Area Comprehensive Plan and the Northgate Overlay Dis-

trict. Simon Property Group owns the Northgate Mall property and prepared the GDPs. Among other things, Simon plans to build commercial, residential, and office buildings on part of the Mall property. The Thornton Creek Legal Defense Fund (Thornton) and Citizens for a Livable Northgate (CFLN) challenged the City's approval of Simon's plans under Washington's Land Use Petition Act (LUPA).[1] Two cases, which the parties refer to as *Northgate* I and *Northgate* II, have been consolidated for purposes of this appeal. Thornton and CFLN raised numerous challenges to the Director's approval of the GDPs. For the reasons discussed below, we uphold the City's approval of Simon's revised GDP.

## PROCEDURAL HISTORY

### *Northgate* I

In 1998, Simon submitted a GDP to the City, proposing to redevelop the Mall in four phases over 15 years. In phase one, Simon plans to build residential, commercial, and office buildings where the south parking lot is now located. The proposed residential development is located over a drainage pipe, which Thornton and CFLN contend is Thornton Creek, a habitat for threatened Puget Sound Chinook salmon and other priority fish species.[2]

In March 1999, the Director of the Department of Construction and Land Use (DCLU) conditionally approved Simon's GDP. Thornton appealed the Director's decision to the Seattle Hearing Examiner, essentially arguing that the Director approved the GDP without conducting an adequate environmental review. The Hearing Examiner rejected that argument but concluded the Director did not

---

[1] Ch. 36.70C RCW. LUPA provides the exclusive avenue for judicial review of most land use decisions and establishes review procedures, standing and petition requirements, and standards for granting relief.

[2] As discussed below, the question of whether the drainage pipe running under the south parking lot of the Mall is, in fact, Thornton Creek is one of the central issues in dispute in this case.

have the authority to conditionally approve the GDP, and thus reversed the Director's decision.

Simon appealed the Hearing Examiner's decision to the superior court. Shortly thereafter, Thornton filed a petition in the superior court challenging portions of the Hearing Examiner's decision under LUPA and the Uniform Declaratory Judgments Act, chapter 7.24 RCW. After a trial, the court ultimately concluded that (1) the Director erred by approving the GDP without requiring a Supplemental Environmental Impact Statement (SEIS) analyzing the environmental impacts of constructing buildings and other structures over Thornton Creek; (2) the Director erred by approving the GDP without conducting a preliminary analysis of the proposal under the City's Critical Areas Ordinance (CAO); (3) the Director was correct in determining that an SEIS analyzing the drainage and water quality impacts of the GDP was not required; and (4) the Director failed to comply with State Environmental Policy Act (SEPA), chapter 43.21C RCW, procedures in approving the GDP, but that the procedural errors were harmless. A final judgment was entered on September 21, 2000.

### *Northgate* II

After the Hearing Examiner reversed the Director's approval of Simon's first GDP, Simon revised the original GDP and resubmitted it to DCLU. In December 1999, the Director approved the revised GDP. Thornton and CFLN again appealed the Director's decision to the Hearing Examiner. The Hearing Examiner issued a Prehearing Order finding that no creek existed underneath the south parking lot. And this time, the Hearing Examiner upheld the Director's decision approving the revised GDP.[3]

---

[3] Because the Hearing Examiner upheld the Director's approval of the revised GDP, we need not decide whether the Hearing Examiner erred in concluding that the Director did not have authority to conditionally approve the original GDP. However, we note that under the Seattle Municipal Code (SMC), a GDP is reviewed as a Type II Master Use Permit (MUP) decision. And, SMC 23.76.020(A) explicitly authorizes DCLU to "grant, deny, or conditionally grant approval of a

Thornton and CFLN appealed to the superior court and, by agreement of the parties, the case was assigned to the same trial judge. Most of the issues raised by Thornton and CFLN in *Northgate* II had already been argued to him in *Northgate* I. The court therefore applied its *Northgate* I rulings to these issues and reversed the Hearing Examiner's finding that there was no creek beneath the south parking lot. The trial court rejected all of Thornton's and CFLN's new challenges to the revised GDP.[4]

## This Appeal

On September 6, 2001, Thornton appealed the trial court's decision in *Northgate* I to this court. The next day, the City sought direct review of the trial court's decision in *Northgate* II in the Supreme Court. The Supreme Court consolidated the two appeals and transferred the *Northgate* I appeal from this court. On March 5, 2002, the Supreme Court transferred the consolidated appeals back to this court.

## FACTS

In 1993, the City of Seattle issued the Northgate Area Comprehensive Plan (NACP) identifying the Northgate Mall and surrounding area as an "urban center." In adopting the plan, the City prepared an Environmental Impact Statement (EIS) in compliance with the SEPA.[5] The Final EIS (FEIS) for the NACP was completed in July 1992. The City then adopted the Northgate Overlay District Zoning

Type II decision." Therefore, the Hearing Examiner erred in finding the Director did not have the authority to conditionally approve the original GDP.

[4] Among other things, Thornton and CFLN unsuccessfully argued that the Director should have required an SEIS evaluating the GDP's impact on traffic, noise, light, and glare.

[5] Ch. 43.21C RCW. SEPA sets out procedures that government agencies must follow to ensure that they consider and document the environmental consequences of their actions. Preparation of an EIS is required under SEPA whenever a proposal is determined to be a "major action[] significantly affecting the quality of the environment." RCW 43.21C.030(2)(c).

provisions codified in chapter 23.71 of the Seattle Municipal Code (SMC). Those provisions require the proponent of any development on sites of six or more acres in the Northgate Overlay District to submit a GDP to DCLU. No development may proceed without an approved GDP.[6]

Simon's Northgate Mall property consists of four parcels. The Mall is located on parcel A. Parcel B is located across the street from the Mall. Parcels C and D are the Mall's south parking lot, which Simon seeks to develop under phase one of the GDPs it submitted to the City. A 60-inch drainage pipe runs under the Mall's south parking lot. Thornton and CFLN maintain this drainage pipe is part of Thornton Creek, an historic salmon habitat, while Simon and the City assert that Thornton Creek begins east of the Mall property and does not run underneath the parking lot. Simon plans to build residential, commercial, and office buildings over the drainage pipe. Simon's plan also includes building a new storm water system for the entire Mall site.

## ISSUES ON APPEAL

### Compliance with SEPA's Procedural Requirements

Thornton Creek and CFLN first argue that when the City approved the GDPs, it failed to follow procedures mandated by SEPA. The Director determined that the original GDP was within the scope of the plans analyzed in the 1991 Draft EIS (DEIS) and the 1992 FEIS. He used those analyses and an "addendum"[7] Simon prepared in 1998 to satisfy SEPA's requirements. Although the Director incorporated the 1992 FEIS into his decision, he did not formally adopt it or circulate the 1998 addendum before conditionally approving the GDP. The trial court concluded that the Director's failure to formally adopt the FEIS and circulate the addendum violated SEPA, but that the procedural error

---

[6] SMC 23.71.020.

[7] SEPA authorizes the use of addendums to add nonsignificant new information on a proposal that has already undergone EIS review.

was harmless because the public received adequate notice of the environmental issues raised by the GDP and was offered an adequate opportunity to be heard on those issues. Thornton and CFLN now ask us to hold that the City's SEPA process was fundamentally flawed and to direct the City to begin a new SEPA process, including preparation of an entirely new EIS.

## Environmental Objections to the GDP

For purposes of this appeal, Thornton Creek and CFLN have raised two basic environmental objections to the proposed development. First, they argued, and the trial court agreed, that building structures directly over the drainage pipe will result in a significant adverse environmental impact. Second, they maintained that the proposed storm water system, which would discharge into Thornton Creek, will have an adverse impact on the salmon habitat. The trial court disagreed with them on this point, concluding that the system proposed in the GDP would likely improve, rather than harm, downstream conditions in Thornton Creek.

Simon and the City now argue the trial court erred in requiring the City to complete an SEIS analyzing the environmental impact of erecting buildings over the drainage pipe. Thornton and CFLN argue that the trial court should have required the City to complete an SEIS addressing the downstream impacts.

## Critical Areas Ordinance

Seattle's Critical Areas Ordinance (CAO) provides in part that "[e]very effort shall be made to avoid building over a riparian corridor located in an underground pipe or culvert, except when located under a street right-of-way[.]"[8] From the outset, both the Hearing Examiner and the trial judge stated they did not intend to make any substantive rulings

---

[8] SMC 25.09.140(E)(1)(a).

on whether the GDPs violated the CAO.[9] Therefore, issues relating to the CAO were never fully briefed and argued by the parties. The trial court did, however, conclude that a portion of Thornton Creek runs through the pipe underneath the Mall's south parking lot. Thus, the trial court concluded that the drainpipe "appeared to be a riparian corridor" under the CAO.

Ultimately, the trial court reasoned that constructing buildings over the underground pipe would appear to violate the CAO on its face. This perceived violation of the CAO formed the basis for its ruling requiring the City to prepare an SEIS analyzing the impact of erecting buildings over the drainage pipe. The trial court ruled that the Director erred in approving the GDP without first conducting a preliminary analysis of the proposal under the CAO. In so doing, the court reversed the Hearing Examiner's determination that CAO issues must be resolved at the time of project level proposals rather than at the GDP stage.

The City and Simon argue that the trial court erred by ruling that the water in the drainpipe appeared to be a "riparian corridor" under the CAO and by directing the DCLU to review the CAO issues before approving the GDP.

## Other Issues

Simon and the City also assert that Thornton and CFLN lack standing to raise issues regarding application of the CAO and the City's SEPA review because they have not shown an "injury-in-fact." And Thornton and CFLN argue the trial court erred by affirming the Hearing Examiner's determination that all future development on the Northgate site will be subject to laws in effect at the time of GDP approval.

---

[9] The trial court dismissed the portion of Thornton's petition asking it to decide whether the CAO would permit Simon to build structures over the drainage pipe under the Mall's parking lot.

# DISCUSSION

## Standard of Review

■ The Land Use Petition Act (LUPA) authorizes the superior court to reverse a land use decision if the party seeking relief shows that:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

(d) The land use decision is a clearly erroneous application of the law to the facts;

(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or

(f) The land use decision violates the constitutional rights of the party seeking relief.[10]

In reviewing an administrative decision, we sit in the same position as the superior court and apply the LUPA standards of review directly to the Hearing Examiner's decision.[11]

## I. STANDING

■ Preliminarily, Simon and the City argue that Thornton and CFLN do not have standing to challenge the Hearing Examiner's decisions on the CAO and SEPA issues because they have not suffered an "injury-in-fact" as a result of those decisions. To establish standing under LUPA, Thornton and CFLN must demonstrate they are

---

[10] RCW 36.70C.130(1)(a)-(f).

[11] *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

"aggrieved or adversely affected by the land use decision."[12] A person is not "aggrieved or adversely affected" under LUPA unless "[t]he land use decision has prejudiced or is likely to prejudice [them]."[13] To satisfy this requirement, Thornton and CFLN must allege facts showing that they would suffer an "injury-in-fact" as a result of the land use decision.[14] In other words, Thornton and CFLN must show they personally "will be 'specifically and perceptibly harmed' by the proposed action."[15]

Although we note that Thornton and CFLN's showing of injury-in-fact is marginal, it is in the parties' best interests to resolve the numerous issues they have raised in the course of this lengthy litigation. Therefore, we assume, without deciding, that Thornton and CFLN have standing and proceed to address the substantive issues before us.

## II. SEPA PROCEDURES

### A. Did the City Violate SEPA Procedures in Approving the GDPs?

In approving the first GDP, the Director incorporated the DEIS for the NACP, the 1992 FEIS, and the 1998 addendum to the FEIS into his decision. The Director determined that the proposed expansion outlined in the GDP fell "within the scope of development analyzed in the EIS documents for this portion of the Northgate area" and did not exceed the development levels anticipated by those documents. The Director then conditionally approved the GDP. Thornton and CFLN claim the Director violated the procedures mandated by Seattle's SEPA rules by: (1) failing to require an environmental checklist under SMC

---

[12] RCW 36.70C.060(2).

[13] RCW 36.70C.060(2)(a).

[14] *Suquamish Indian Tribe v. Kitsap County*, 92 Wn. App. 816, 829, 965 P.2d 636 (1998).

[15] *Trepanier v. City of Everett*, 64 Wn. App. 380, 382, 824 P.2d 524 (quoting *Save a Valuable Env't v. Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978)), *review denied*, 119 Wn.2d 1012 (1992).

25.05.315, (2) failing to conduct a threshold determination of whether an EIS was necessary, (3) making critical SEPA decisions before a specific project proposal was submitted, (4) failing to take a "hard look" at the environmental consequences of the proposal, (5) failing to formally adopt the 1992 FEIS, and (6) failing to properly circulate the addendum.

### 1. Threshold Determination and Use of Existing Documents

██ ██ Seattle's SEPA Rules, chapter 25.05 SMC, were enacted to implement SEPA and the implementing rules found in chapter 197-11 WAC.[16] SEPA requires preparation of an EIS for all "major actions significantly affecting the quality of the environment."[17] The SEPA Rules require the responsible official in the lead agency to make a "threshold determination" about whether preparation of an EIS is required for a given proposal.[18] Ordinarily, the agency is required to use an "environmental checklist" to assist it in making this threshold determination.[19] But preparation of an environmental checklist is not required for "proposals on which the lead agency has decided to prepare its own EIS, [or for] proposals on which the lead agency and applicant agree an EIS will be prepared."[20] And, "[a]n action which does not have an environmental impact substantially different from an earlier proposed action does not require either a new threshold determination or a new supplemental draft or final environmental impact statement."[21] By definition these actions do not require a checklist as such because it is only a preliminary document.

---

[16] SMC 25.05.010.

[17] RCW 43.21C.030(2)(c).

[18] SMC 25.05.330.

[19] SMC 25.05.315.

[20] SMC 25.05.315(A).

[21] *SEAPC v. Cammack II Orchards*, 49 Wn. App. 609, 613, 744 P.2d 1101 (1987).

■ ■ To avoid "wasteful duplication of environmental analysis and to reduce delay," the SEPA Rules encourage and facilitate reusing existing environmental documents.[22] Under certain circumstances, "existing documents may be used to meet all or part of an agency's responsibilities under SEPA."[23] The City's rules allow for both "adoption" and "incorporation by reference" of existing documents.[24] Professor Settle summarizes the difference between these two methods of using existing documents as follows:

> When an agency decides to use all or part of an existing SEPA document to constitute its checklist or EIS, the agency "adopts" all or part of the existing document. In such cases, the checklist or EIS would be composed of the adopted document and perhaps an addenda or SEIS. The only new environmental analysis conducted by the adopting agency would be in the addendum or SEIS.
>
> When an agency decides to use all or part of an existing SEPA document as part of a checklist or EIS, the agency incorporates by reference all or part of the existing document into the checklist or EIS it is preparing. In such cases the borrowed material does not become the checklist or EIS but merely a portion of the analysis included in the checklist or EIS.[25]

Adoption of an existing EIS is explicitly authorized when "a proposal is substantially similar to one covered in an existing EIS."[26] If an agency adopts an existing document, it must independently assess the sufficiency of the document, identify the document and state why it is being adopted, make the adopted document readily available, and circulate the statement of adoption.[27] By contrast, when an agency incorporates existing documents by reference, it is

---

[22] RICHARD L. SETTLE, THE WASHINGTON STATE ENVIRONMENTAL POLICY ACT: A LEGAL AND POLICY ANALYSIS § 15, at 209 (2001).

[23] SMC 25.05.600(A).

[24] SMC 25.05.600(D)(1), (2).

[25] SETTLE, *supra* n.22, § 15, at 210-11 (footnotes omitted).

[26] SMC 25.05.600(D)(5).

[27] SMC 25.05.630; SETTLE, *supra* n.22, § 15, at 211-12.

required only to identify and briefly describe the incorporated material, and to make the material available for public review during comment periods.[28]

■ The SEPA Rules provide that when an agency uses existing documents to meet all or part of its SEPA responsibilities, addenda and SEISs may be prepared to remedy shortcomings of documents that have been adopted or incorporated by reference.[29] An addendum is the appropriate vehicle for adding analyses or information about a proposal that "do[] not substantially change the analysis of significant impacts and alternatives in the existing environmental document."[30] By contrast, an agency must prepare an SEIS if there are "[s]ubstantial changes so that the proposal is likely to have significant adverse environmental impacts," or if there is "[n]ew information indicating a proposal's probable significant adverse environmental impacts."[31]

In this case, the Director incorporated the 1991 DEIS and the 1992 FEIS for the NACP by reference into his decision and determined that the proposals included in the GDP fell within the scope of development analyzed in these existing documents. Because he determined the environmental impact of the GDP was not substantially different from that analyzed in the 1992 FEIS, the Director was entitled to rely on existing documents and was not required to conduct a new threshold determination or prepare a new EIS.[32] However, because the Director was using the existing documents *in place of* preparing a new checklist or EIS, rather than *as part of* a checklist or EIS that DCLU was preparing, the Director should have adopted the documents

---

[28] SMC 25.05.635; SETTLE, *supra* n.22, § 15, at 212.

[29] SMC 25.05.600(D)(3), (4); SETTLE, *supra* n.22, § 15, at 210.

[30] SMC 25.05.600(D)(3).

[31] SMC 25.05.600(D)(4)(a), (b).

[32] *SEAPC*, 49 Wn. App. at 613.

rather than incorporated them by reference.[33] Thornton is thus correct when it asserts the City erred by failing to issue a formal "adoption notice."[34]

### 2. Circulation of the Addendum

Thornton also argues that the City should have circulated the addendum to recipients of the 1992 FEIS. SMC 25.05.625 provides that an addendum supplementing an FEIS must be circulated to recipients of the FEIS, and a "notice of addendum availability" must be circulated to "interested persons" and made available for public comment. However, SMC 25.05.630(C)(3) provides that when an existing EIS is adopted and an addendum is being prepared, "the agency shall include the statement of adoption with the addendum and circulate both as required in subsection C1 of this section." There appears to be a conflict between the two provisions because they have different requirements for circulating an addenda to an FEIS.

■ In this case, the City maintains it circulated "notices of the availability of the EIS addendums to everyone who should have received the statement of adoption and addendum pursuant to [subsection] C1 [of SMC 25.05.630]." The City is correct that SMC 25.05.630 controls because it addresses the specific situation where, as here, an addendum is prepared in the context of the adoption of an existing EIS.[35] But, as the City admits, it did not comply with that provision because it circulated only a "notice of availability" of the addendum rather than the notice of adoption and the addendum itself. While we reject Thornton's argument that

---

[33] *See* SMC 25.05.600; Settle, *supra* n.22, § 15, at 210-11. Simon argues the City was not required to adopt the 1992 FEIS because the GDP was not a new proposal, but merely a continuation of the NACP. We reject this argument because the GDP was submitted years after the NACP process was completed and is clearly an implementing plan.

[34] SMC 25.05.630(B), .965.

[35] *See Knowles v. Holly*, 82 Wn.2d 694, 702, 513 P.2d 18 (1973) (Where there is a conflict between one statutory provision which deals with the subject in a general way and another which deals with the same subject in a specific manner, the specific statute will prevail.).

SMC 25.05.625 controls on the issue of circulation require-ments in this case, we agree that the City erred by failing to properly circulate the addendum.

### 3. Timing of Environmental Review

Thornton also asserts that the Director violated SMC 25.05.055(B) by making critical SEPA decisions before it had an application or definite development proposal. SMC 25.05.055(B) provides that SEPA review should begin "at the earliest possible point in the planning and decision-making process, when the principal features of a proposal and its environmental impacts can be reasonably identi-fied." It states that "[t]he fact that proposals may require future agency approvals or environmental review shall not preclude current consideration, as long as proposed future activities are specific enough to allow some evaluation of their probable environmental impacts."[36] The provision also incorporates the SEPA policy that its "procedures contemplate environmental review and preparation of EIS's on private proposals at the conceptual stage rather than the final detailed design stage."[37]

▉ Thornton argues the GDPs were not detailed enough to allow reasonable identification of their environmental impacts and therefore the SEPA process began and ended without a meaningful evaluation of the potential impacts. Thornton's argument is flawed. It ignores the fact that "[a]pplications for master use permits for development contained in an approved General Development Plan are subject to the requirements of Chapter 25.05 (SMC), SEPA Policies and Procedures."[38] The SEPA review process does not end with approval of the GDP because future proposals for development in accordance with the GDP will also be subject to SEPA review. Therefore, we reject Thornton's argument that SEPA review at the GDP stage is premature.

---

[36] SMC 25.05.055(B)(1)(a).

[37] SMC 25.05.055(D).

[38] SMC 23.71.029(C).

### 4. "Hard Look" Requirement

Thornton lastly argues the City violated SEPA procedures by failing to take a "hard look" at the possibility of environmental impacts before deciding that an addendum to the 1992 FEIS, rather than a new EIS, was all that was required in approving the GDP. Essentially, this argument repeats Thornton's earlier claim that the Director erred by failing to make a threshold determination. But Thornton cites no evidence in the record supporting its assertion that the Director "admitt[ed] he made his decision without information or analysis." Based on this lack of evidence and our discussion of the threshold determination requirement, we reject this argument.

## B. Harmless Error

Even when there are procedural errors in the decision-making process, a land use decision may not be reversed under LUPA if the court determines the errors were harmless.[39] We "review procedural errors during the EIS process under the rule of reason and where such errors are of no consequence, they must be dismissed."[40] Thornton and CFLN argue the superior court erred in concluding that the City's failure to formally adopt the 1992 FEIS and circulate the 1998 addendum constituted harmless error. After holding a trial on the harmless error issue, the trial judge concluded that "[t]he public in this case received adequate notice of the environmental issues raised by the GDP and was afforded an opportunity to be heard at least as good as that which would have been afforded under the formal adoption procedure."

Thornton and CFLN primarily rely on a federal case brought under the National Environmental Policy Act of

---

[39] RCW 36.70C.130(1)(a).

[40] *Concerned Taxpayers Opposed to Modified Mid-S. Sequim Bypass v. Dep't of Transp.*, 90 Wn. App. 225, 233, 951 P.2d 812 (1998).

1969 (NEPA)[41] for the proposition that the City's procedural violations were not harmless. In *California v. Block*,[42] the Forest Service released a DEIS to the public detailing several alternatives as potential proposed actions.[43] However, after the public comment period ended, the Forest Service filed an FEIS identifying a proposed action that was not one of the alternatives contained in the DEIS.[44] The FEIS was not released to the public, but was circulated "only to Congress and to affected federal and state agencies."[45] The Ninth Circuit held that the Forest Service violated NEPA by failing to release to the public a supplemental DEIS describing the proposed action.[46] The court reasoned that "[b]y refusing to disclose its Proposed Action until after all opportunity for comment has passed, an agency insulates its decision-making process from public scrutiny."[47] The court then announced a general rule requiring the EIS process to both "alert the public of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process."[48]

Respondents concede that the City never prepared or circulated a "statement of adoption" in accordance with SMC 25.05.630(C)(3).[49] But DCLU Director John Shaw

---

[41] 42 U.S.C. §§ 4321-4370d.

[42] 690 F.2d 753 (9th Cir. 1982).

[43] *Id.* at 758.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 769.

[47] *Id.* at 771.

[48] *Id.* at 772.

[49] That provision requires the City to circulate the statement of adoption and addendum to the Department of Ecology, agencies with jurisdiction, cities/counties in which the proposal will be implemented, the SEPA Public information Center, and local agencies or political subdivisions whose public services would be changed as a result of implementation of the proposal. It also requires the agency to either (1) send the adoption notice and addendum to persons or organizations that have expressed an interest in the proposal or are known by the agency to

testified at trial that DCLU sent a "notice of addendum" to all parties who should have received a "statement of adoption" under SMC 25.05.630. The notice was sent to over 300 people and organizations that had either expressed an interest in the GDP and asked to be notified, or who were known to have a general interest in development activity in Seattle. Shaw also testified that copies of the 1998 addendum were distributed to the Citizens Advisory Committee for the Northgate GDP, and that members of the public were advised they could obtain copies of the addendum from DCLU. Shaw's testimony reveals that the period for public comment on the notice of addendum was set for at least 28 days, significantly longer than the 7 days required by SMC 25.05.630.

Shaw further testified that the City held several public meetings to introduce the GDP to the public and accept public comment on it. He stated that DCLU provided public notice for each of the meetings. Exhibits consisting of over 80 comment letters received by DCLU were introduced into evidence at trial. Shaw also testified that he received "some e-mails" and "a number of phone calls about the project." And, he stated that there were several newspaper articles discussing the proposed GDP.

Although Thornton presented witnesses who testified that the DCLU's notification procedures in this case were inadequate, Shaw's testimony demonstrates there was substantial evidence in the record from which the trial court could reasonably conclude that the City's procedural errors were harmless. Unlike the Forest Service in *Block*, DCLU did not take final action without releasing notice of the proposed action to the public. Rather, substantial evidence in the record suggests that the public received adequate notice of, and was afforded ample opportunity to be heard on, the environmental issues raised by the GDP. Accord-

have an interest in the type of proposal being considered, or (2) announce the adoption in agency newsletters or through other means. It further provides that "[n]o action shall be taken on the proposal until seven (7) days" after circulation of the statement of adoption and addendum.

ingly, we affirm the trial court's ruling that the City's errors were harmless in this case.[50]

## III. CONSTRUCTION OVER THE DRAINAGE PIPE

The Director concluded that an SEIS evaluating the potential environmental impacts of erecting buildings over the drainage pipe was not necessary because those issues were adequately analyzed in the 1992 FEIS and 1998 addendum. The Hearing Examiner determined she did not have the authority to determine whether the Director's decision on this point was adequate.

At the superior court level, Thornton argued an SEIS on the environmental impact of building over the pipe was required, and requested an open record trial on this issue. The City argued that the only possible impact of building over the pipe would be to make a future "daylighting" project more expensive and that, as a matter of law, this could not be an "impact" under SEPA requiring an SEIS. The trial court apparently agreed and granted the City's motion in limine, excluding all evidence on the impacts that would result from building over the pipe. But even though the issue was never litigated, the trial court determined that because the GDP appeared to violate the CAO, it was likely to have a significant adverse effect on the environment not contemplated by the 1992 FEIS. Thus, an SEIS was required to address that issue. Thornton argues that the trial court erred in granting the City's motion in limine. The City and Simon argue the trial court erred in requiring an SEIS based on an apparent violation of the CAO.

 Because the decision whether or not to require an SEIS involves an application of law to facts, it is subject

---

[50] *See Concerned Taxpayers*, 90 Wn. App. at 233 (failure to formally incorporate a report into an FEIS was harmless error when the report was circulated with the FEIS and was considered by transportation commission).

to the "clearly erroneous" standard of review.[51] A decision is clearly erroneous when, after reviewing the record as a whole, we are left with the definite and firm conviction that a mistake has been made.[52] SEPA requires us to accord "substantial weight" to the governmental agency's decision.[53]

## A. Exclusion of Evidence

We must first determine whether the trial court erred in granting the City's motion in limine, barring Thornton from presenting any evidence on the impact that building over the drainpipe would have on the environment. The trial court's decision to exclude evidence is reviewed for an abuse of discretion.[54]

SEPA requires an SEIS only when a proposal is likely to have "significant adverse *environmental* impacts."[55] Thus, in order to show that an SEIS is required on the impacts resulting from building over the drainage pipe, Thornton must demonstrate a reasonable probability that building over the pipe will produce "more than a moderate effect" on the quality of the environment.[56] In its offer of proof, Thornton stated that it would have presented testimony that construction over the pipe would have "a continuing and significant impact on salmon recovery efforts" because it would make any future restoration projects to "daylight" the portion of the creek located in the drainage pipe difficult or impossible. The City counters that the fact

[51] RCW 36.70C.130(1)(d). *See Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000) (challenge to a Mitigated Determination of Nonsignificance reviewed under LUPA's "clearly erroneous" standard).

[52] *See Wenatchee Sportsmen*, 141 Wn.2d at 176.

[53] RCW 43.21C.090; *see Moss v. City of Bellingham*, 109 Wn. App. 6, 13-14, 31 P.3d 703 (2001).

[54] *State v. Rehak*, 67 Wn. App. 157, 162, 834 P.2d 651 (1992), *review denied*, 120 Wn.2d 1022, *cert. denied*, 508 U.S. 953 (1993).

[55] SMC 25.05.600(D)(4)(a) (emphasis added).

[56] *Norway Hill Pres. & Prot. Ass'n v. King County Council*, 87 Wn.2d 267, 278, 552 P.2d 674 (1976).

that any future "daylighting" projects would be rendered more difficult if buildings are constructed over the pipe is a financial impact, not a physical one, under SEPA.

It is uncontested that the water running under the Northgate Mall property was enclosed in a drainage pipe decades before SEPA was enacted. Thornton has not offered any evidence showing that erecting buildings over the pipe will change the current physical conditions of the waters in the drainage pipe or the waters flowing upstream and downstream from the pipe. And, Thornton cites no authority for the proposition that making a hypothetical future restoration project more difficult constitutes an adverse environmental impact under SEPA.[57] Because Thornton's proffered evidence did not show how the proposed construction over the pipe would adversely impact existing environmental conditions, we hold that the trial court properly granted the City's motion in limine.

## B. Did the Trial Court Err in Requiring an SEIS?

The trial court held that the Director erred in approving the GDPs without requiring an SEIS evaluating potential environmental impacts of constructing buildings and other structures over the drainage pipe. The court's conclusion that construction over the pipe would have a significant adverse environmental impact was based not on the arguments discussed in the previous section but rather on its conclusion that the proposal appeared to violate the CAO.

We reverse the trial court's ruling on this issue because, even if the trial court's belief that the GDP appeared to violate the CAO were correct, an apparent violation of the CAO, by itself, does not constitute a signifi-

---

[57] Rather, the case law seems to contradict Thornton's position. *See, e.g., Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995) ("If the purpose of NEPA is to protect the *physical* environment, and the purpose of preparing an EIS is to alert agencies and the public to potential adverse consequences to the land, sea or air, then an EIS is unnecessary when the action at issue does not alter the natural, untouched physical environment at all."), *cert. denied,* 516 U.S. 1042 (1996).

cant adverse environmental impact under SEPA. The SEPA rules provide that

> Proposals that will be located within environmentally critical areas are to be treated no differently than other proposals under this chapter, except as stated in the prior subsection [not applicable here]. A threshold determination shall be made for all such actions, and an EIS shall not be automatically required for a proposal merely because it is proposed for location in an environmentally critical area.[58]

Thus, an SEIS is not automatically required simply because the GDP calls for development located in what might be an environmentally critical area.

Thornton correctly points out that in determining an impact's significance, the SEPA Rules state that the responsible official should take into account whether a "proposal may to a significant degree . . . [c]onflict with local, state, or federal laws or requirements for the protection of the environment[.]"[59] But, as noted above, Thornton has not presented evidence showing that erecting buildings or structures over the drainage pipe would have any impact at all on existing environmental conditions.[60] And, as discussed below, the issue of whether erecting buildings or structures over the drainage pipe would violate the CAO has not been, and should not be, resolved at the GDP stage.[61] For these reasons, we reverse the trial court's holding that an SEIS is required on this issue.

---

[58] SMC 25.05.908(E).

[59] SMC 25.05.330(C)(5)(c).

[60] Thornton notes that there is evidence in the record showing that Thornton Creek continues to provide a habitat to threatened salmon species. While this may be true, Thornton points to no evidence showing that the proposed construction over the drainage pipe would alter the present environmental condition of Thornton Creek. As the trial court determined, the impact on the interests Thornton has expressed is fiscal, not physical.

[61] As Thornton correctly points out, the CAO seeks to encourage restoration of riparian corridors presently located in underground pipes. SMC 25.09.140(E)(1).

## IV. STORM WATER DRAINAGE SYSTEM

▇▇▇ Thornton and CFLN argue the trial court erred by failing to require the Director to complete an SEIS on impacts of the proposed storm water drainage system. After conducting a trial on the issue, the judge concluded as follows:

> Thornton Creek contends that the GDP is likely to result in site specific, significant adverse environmental impacts to water quality, drainage, and creek habitat that were not adequately addressed by the 1992 FEIS. The evidence at trial, however, established otherwise. The court is satisfied, first, that the 1992 FEIS adequately analyzed the drainage and water quality impacts to be anticipated as a result of the Northgate GDP. More significantly, however, the evidence showed that the GDP, with its proposed detention pond and system, would likely result in an actual improvement in drainage, storm water, water quality and creek habitat conditions in Thornton Creek east of the Mall site. . . .

As stated above, we review the trial court's decision not to require an SEIS under the "clearly erroneous" standard of review.[62] However, the trial court's determination that the proposed system would improve, rather than have an adverse impact on, existing environmental conditions is reviewed under the "substantial evidence" standard because it is a factual finding.[63]

We conclude that substantial evidence in the record supports the trial court's finding that the proposed storm water system is not likely to have a significant *adverse* environmental impact on Thornton Creek, and therefore affirm the trial court's conclusion that an SEIS on this issue

---

The CAO thus states that "[e]very effort shall be made to avoid building over a riparian corridor located in an underground pipe . . . ." SMC 25.09.140(E)(1)(a). But, as discussed below, any issues regarding compliance with the CAO are properly resolved at the project level, rather than at the GDP phase of development.

[62] RCW 36.70C.130(1)(d).

[63] RCW 36.70C.130(1)(c).

is not required. Today, the Mall property is virtually 100 percent covered with impervious surfaces, consisting primarily of parking lots and building rooftops. Drainage from the Mall site flows to various collection points that ultimately drain into Thornton Creek.[64] Because the additional buildings and parking lots the GDP proposes to construct *will be built primarily on existing parking lots*, the GDP will not increase the amount of impervious surface on the site.

The GDP also proposes a wet pond and detention facility on the Mall property. This will decrease the percentage of impervious surface at the Mall site. At trial, Carol Pennie, a storm water engineer, testified that the wet pond and detention facility would decrease the runoff from the Mall site and would result in an overall improvement in water quality. Dr. Don Weitkamp, a fisheries biologist, testified that the GDP's proposed wet pond and detention facility would improve the habitat conditions and the water quality in Thornton Creek.

Thornton's reliance on *Oregon Natural Desert Ass'n v. Green (ONDA)*[65] is misplaced. There, the federal Wild and Scenic Rivers Act required the Bureau of Land Management (BLM) to issue a " 'comprehensive management plan' " to protect the Donner und Blitzen river area's " 'outstandingly remarkable values.' "[66] Although BLM could have excluded cattle from the river area, it instead proposed to authorize continued cattle grazing, construct parking lots, and improve roads and water development in the river area. BLM argued "an EIS was not required because livestock grazing in the Donner und Blitzen river area is the status quo, and an EIS is not required for an agency's continued management activities that have been

---

[64] Impervious surfaces cause more runoff and therefore more drainage into the creek.

[65] 953 F. Supp. 1133 (D. Or. 1997).

[66] *Id.* at 1137 (quoting 16 U.S.C. §§ 1274(d)(1), 1271).

in existence for many years."[67] The agency also argued an EIS was not required because the purpose of the proposed action was "not to continue grazing, but to take measures to protect the River's 'outstandingly remarkable values.' "[68] The *ONDA* court rejected these arguments, concluding that the plan "to authorize continued cattle grazing, the construction of parking lots, the improvement of roads and water development is more than merely continuing activities."[69] Unlike the BLM in *ONDA*, the City in this case was not faced with the option of eliminating an existing activity that adversely affected the environment.[70] Rather, the City could either accept or reject a GDP which, as discussed above, would likely improve existing water quality conditions by reducing impervious surfaces and runoff into Thornton Creek. Therefore, *ONDA* does not support Thornton's argument.

Thornton also argues it was improper for the trial court to rely on testimony that the wet pond would benefit Thornton Creek because the wet pond "is just a proposal" and Simon is not required to build it. This argument is not convincing. Thornton cannot simultaneously argue that the storm water drainage system will have significant adverse environmental impacts and that the storm water drainage system will not have beneficial environmental impacts because it might never be built.

In sum, we conclude there is substantial evidence in the record supporting the trial court's conclusion that the proposed wet pond and detention system will result in benefits to the water quality and habitat in Thornton Creek. Because downstream conditions will benefit rather than suffer a significant adverse environmental impact as a

---

[67] *Id.* at 1147.

[68] *Id.* (quoting 16 U.S.C. § 1271).

[69] *Id.*

[70] For example, the City does not have authority to require Simon to "daylight" the water flowing through the drainage pipe.

result of the GDP, SEPA does not require an SEIS on this issue.

## V. CRITICAL AREAS ORDINANCE

Thornton Creek and CFLN appealed from the Hearing Examiner's conclusion that the Director was not required to consider whether the GDPs complied with the CAO before approving them. The trial court essentially agreed with them, holding that the "Director erred in taking action on the GDP without first conducting a preliminary analysis of the proposal under the City's Critical Areas Ordinance[.]" Simon and the City argue that the trial court erred because under the Seattle Municipal Code, a GDP need not be reviewed for consistency with the CAO before it is approved.

The City and Simon are correct. Chapter 23.71 of the Seattle Municipal Code regulates land use and development within the Northgate Overlay District. SMC 23.71.020 requires a property owner to submit a GDP under certain circumstances. A GDP is defined as "a conceptual plan for site development."[71] SMC 23.71.028 provides that to obtain approval, a GDP "must be consistent with the Northgate Comprehensive Plan and the provisions of this chapter."

These code provisions make it clear that the Director need not determine whether a GDP complies with the CAO before approving it. Rather, a GDP need only be consistent with the NACP and the code provisions implementing that plan (ch. 23.71 SMC). The CAO is set forth in chapter 25.09 of the Seattle Municipal Code. SMC 25.09.040 states in part that "[t]he standards of this chapter shall apply to all public and private proposals for new structures . . . located on either public or private property within environmentally critical areas and their buffers." The CAO, by its own terms, does not apply to GDPs because a GDP is not a "proposal[]

---

[71] SMC 23.71.024(A).

for [a] new structure[]."[72] Rather, as stated above, a GDP is only a "conceptual plan" for development. Therefore, the Hearing Examiner was correct in determining that CAO issues did not have to be decided at the GDP stage.

Relying on *Loveless v. Yantis*,[73] Thornton and CFLN maintain the GDP shows an apparent violation of the CAO and that, therefore, the trial court was correct in requiring the Director to conduct a preliminary analysis under the CAO before approving the GDP. In *Loveless*, the Washington Supreme Court reversed approval of a preliminary plat where the height of the proposed structures on the plat violated applicable county height regulations. The court acknowledged that preliminary plats were ordinarily reviewed only to the extent necessary to determine whether the general design and layout of the plat complied with zoning regulations. However, because the height of the proposed structures in the plat clearly violated height regulations, the court held it was error to approve the plat. Thornton and CFLN argue that, like the height violations in the preliminary plat in *Loveless*, the apparent CAO violation in the GDP should preclude the Director from approving the GDP.

*Loveless* is distinguishable from this case in two important respects. First, in considering preliminary plats of proposed subdivisions, the planning commission was required " 'to assure conformance of the proposed subdivision to the general purposes of the comprehensive plan and to planning standards and specifications as adopted by the . . . county[,]' " including applicable height regulations.[74] By contrast, where the Director is considering a GDP, he is required only to ensure that the GDP conforms to the NACP and the code provisions implementing that plan (ch. 23.71 SMC). Second, unlike the clear height violations in the plat in *Loveless*, it is not clear here

---

[72] SMC 25.09.040.

[73] 82 Wn.2d 754, 513 P.2d 1023 (1973).

[74] *Id.* at 761 (quoting RCW 58.17.100).

whether the planned structures in the GDP would in fact violate the CAO. The issue of whether the drainage pipe is a "riparian corridor" under the CAO was not litigated before the Hearing Examiner or the trial court. Without a resolution of this contested issue, Thornton and CFLN are incorrect in maintaining that *Loveless* requires reversal of the Director's approval because the GDP in fact violates the CAO on its face.

For these reasons, we reverse the trial court's holding that the Director erred in taking action on the GDP without first conducting a preliminary analysis of the proposal under the CAO. We affirm the Hearing Examiner's conclusion that the issue of CAO compliance should not be litigated at the GDP level.[75]

## VI. EXISTENCE OF THE CREEK

SMC 23.71.024(A)(8)(a) requires a GDP to include "[p]lans showing the proposed finished grades, drainage patterns, swales, *creeks*, retention ponds, and wetlands[.]"[76] In reviewing the Director's approval of the GDP, the Hearing Examiner had to determine whether the water in the drainage pipe under the Mall's parking lot was a "creek" that should have been identified in Simon's GDP. In reviewing the original GDP, the Hearing Examiner found that Thornton Creek did not exist on the Mall property. The superior court overturned this finding, reasoning that the parties were bound by the Director's unchallenged finding that Thornton Creek did in fact flow through the drainage pipe below the Mall's parking lot.

We will uphold the Hearing Examiner's factual finding so long as it is supported by substantial evidence in the record.[77] "Substantial evidence is evidence in sufficient

---

[75] When Simon submits a proposal to actually build over the drainage pipe, the City must determine compliance with the CAO.

[76] (Emphasis added.)

[77] RCW 36.70C.130(1)(c). LUPA dictates the applicable standard of review here and, as we noted above, we apply that standard to the Hearing Examiner's ruling.

quantum to persuade a fair-minded person of the truth of the declared premise."[78] In the proceedings before the Hearing Examiner, Dr. James Kelley, a wetland ecologist, testified that aerial photographs of the area taken from 1936 to 1969 show that the only water feature on what is now Mall property was an artificial drainage ditch, not a natural creek.[79] Although Thornton presented some conflicting evidence on this issue, Dr. Kelley's testimony about the aerial photographs is uncontroverted and is sufficient to persuade a reasonable person of the truth of the Examiner's finding that "over 60 years ago, a drainage ditch, not a creek, conveyed water across the site."[80]

The Hearing Examiner's finding that Thornton Creek did not exist on Mall property was made in the context of determining whether Simon was required to identify the creek on the GDP plans. In reviewing the Director's approval of the revised GDP, the Hearing Examiner found "there is no creek present on the site and the drainage pipe under the site is not a riparian corridor, as that is defined in SMC 25.09.020(B)(3)." Because the Hearing Examiner had previously determined that she did not have the jurisdiction to resolve CAO issues at the GDP stage and did not allow the parties to litigate the issue, she had no basis in the record for concluding the pipe is not a "riparian corridor" under the CAO.

---

*Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). Therefore, we reject Thornton's contention that the Director's findings are verities on appeal.

[78] *Ridgeview Props. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982).

[79] Dr. Kelley based his conclusion, in part, on the fact that the water feature under what is now Mall property had a "linear structure" and looked "exactly like dozens and dozens of other agricultural ditches that I see constructed across wetlands."

[80] Thornton argues that the Hearing Examiner "excluded most of Thornton's evidence showing the Creek's existence." But Thornton's citations to the record in support of this assertion do not show that the Hearing Examiner excluded this evidence. Rather, the record reveals that Thornton did present evidence and testimony on the location of the creek during the proceedings before the Examiner.

## VII. VESTING

 Thornton's final argument is that the Hearing Examiner erred in concluding the projects anticipated in the approved GDP will be subject to the development standards in place at the time of the GDP approval. The legal effect of a GDP approval is a question of law. LUPA authorizes us to reverse the Hearing Examiner's decision if it is based on "an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise[.]"[81]

 The doctrine of vested rights " 'allow[s] developers to determine, or "fix," the rules that will govern their land development.' "[82] Under the Seattle Municipal Code, development rights vest "either (1) when a developer files a complete building permit application at any point in the MUP [Master Use Permit] permitting process (known as a 'combined MUP'), or (2) when the MUP is issued by the City, even if no building permit has been submitted (known as a 'straight MUP')."[83]

Thornton argues that this provision does not grant vested rights based on GDP approval because it speaks only to building permit applications and MUPs and does not refer to GDPs. Simon argues that because GDPs are reviewed as Type II MUP decisions, approving a GDP is equivalent to issuing an MUP for vesting purposes.[84]

 The City disagrees with both arguments. It maintains that chapter 23.71 SMC, which regulates land use and development in the Northgate Overlay District, contains its own vesting rule for GDPs. SMC 23.71.029 provides that "[a]fter a General Development Plan has been

---

[81] RCW 36.70C.130(1)(b).

[82] *Erickson & Assocs. v. McLerran*, 123 Wn.2d 864, 868, 872 P.2d 1090 (1994) (quoting *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986)).

[83] *Id.* at 869. "Master Use Permits (MUPs) are site plan approval permits employed by the City of Seattle to streamline the regulatory review process." *Id.* at 866.

[84] SMC 23.71.020(D).

approved, the applicant may develop in accordance with the approved plan." The City argues that this provision "necessarily means that an applicant may develop the property consistent with the GDP regardless of subsequent changes to zoning that might otherwise apply." We agree with the City. SMC 23.71.029 was enacted after Seattle's general vesting provision and deals specifically with vesting for GDPs. Since SMC 23.71.029 is both later enacted and more specific than SMC 23.76.026, it controls here.[85]

In interpreting SMC 23.71.029, we attempt to give meaning to all of the language in the provision and interpret it in a way that avoids an absurd result.[86] The provision states that after a GDP is approved, "the applicant may develop in accordance with the approved plan."[87] The City correctly notes that "[i]f projects that are included within an approved GDP could be later denied because of changes to zoning regulations after approval of the GDP, a landowner would gain nothing by approval of a GDP." Therefore, if the provision is not interpreted as granting the applicant vesting rights upon GDP approval, the provision would have no meaning.[88] We therefore affirm the Hearing Examiner's conclusion that the legal effect of the revised GDP's approval is to vest the property owner with the right to develop in accordance with that plan.

In sum, we affirm the trial court's holding that although the City violated SEPA procedures, the procedural errors were harmless. We also affirm the trial court's ruling excluding Thornton's evidence on the impacts of erecting buildings and structures over the drainage pipe, but re-

---

[85] *Citizens for Clean Air v. City of Spokane*, 114 Wn.2d 20, 37, 785 P.2d 447 (1990) ("Generally, provisions of a specific more recent statute prevail in a conflict with a more general predecessor.").

[86] *Johanson v. Dep't of Soc. & Health Servs.*, 91 Wn. App. 737, 749, 959 P.2d 1166 (1998), *review denied*, 137 Wn.2d 1010 (1999).

[87] SMC 23.71.029(A).

[88] Also, given that LUPA directs us to give due deference to the construction of the provision by a local jurisdiction with expertise, we note that the DCLU Director indicated, in his analysis of the GDP, that "[d]evelopment occurring under the Plan will be subject to development standards in place at the time of the [GDP] approval."

verse the trial court's order requiring an SEIS on that issue. We affirm the trial court's holding that an SEIS on the impacts of the proposed storm water drainage system is not required. We affirm the Hearing Examiner's findings that the GDPs need not be reviewed for consistency with the CAO before they are approved and reverse the trial court's holding that the City must conduct a preliminary analysis under the CAO before approving the GDP. We affirm the Hearing Examiner's finding that no creek exists on the Mall property for purposes of SMC 23.71.024(A)(8)(a) and reverse the trial court's finding that a creek does exist on Mall property and must be identified on the GDP. Lastly, we affirm the Hearing Examiner's conclusion that future development proposals on the Northgate site will be subject to the laws and rules in effect at the time of GDP approval.

COLEMAN and BAKER, JJ., concur.

Respondents' motion for reconsideration granted and opinion modified September 25, 2002.

Appellants' motion for reconsideration denied September 25, 2002.

Review denied at 149 Wn.2d 1013 (2003).